AMERICAN EXPRESS COMPANY, Appellee, v. DES MOINES
NATIONAL BANK, Appellant.

**APPEAL AND ERROR:** Review—Evidence—Unsupported Theory—
1 **Fair Question of Fact.** Conceding that the truth of a theory
is not established by circumstantial evidence which is just as con-
sistent with the nonexistence of the truth of the theory as with
its existence, *yet it is a principle applicable to cases of circum-
stantial evidence alone.* It has, by its very terms, no application
to a case wherein the theory presented has support in both direct
and circumstantial evidence, and wherein is presented a fair
question of fact, for the jury, not for the appellate court.

**EVIDENCE:** Relevancy, Materiality and Competency—Necessity for
2 **Foundation—Theft by Employee.** If offered testimony goes no
farther than to furnish a peg upon which the jury may hang a
mere conjecture, it is fatally lacking in foundation.

PRINCIPLE APPLIED: A Des Moines bank shipped to the
Bank of Irwin a package supposed to contain $2,000. The package
passed through the hands of several of the employees of the express
company, but, when it reached the Bank of Irwin, it contained
nothing but waste paper. The express company paid the loss to
the Bank of Irwin and brought suit against the Des Moines bank,
on the theory that the money had been fraudulently taken from
the package by some employee of the bank before it was delivered
to the express company. The Des Moines bank defended on the
theory that some employee of the express company abstracted the
money. The express company (plaintiff) sought to show that, at
the time it received the package, one Spencer was in the employ
of the defendant bank, and was subsequently convicted of embez-
zling the funds of the bank. *It was not shown that Spencer
handled or had access to the package. Held,* the offered evidence
was not admissible because of lack of proper foundation.

**EVIDENCE:** Relevancy, Materiality and Competency—Condition of
3 **Rifled Money Package.** Any evidence that tends in any reason-
able degree to establish the probability or improbability of a fact
in issue, *no matter how slight its weight may be,* is relevant. So
held in regard to the condition of a rifled money package.

PRINCIPLE APPLIED: (Facts additional to those under No.
2.) The rifled package was not produced at the trial, having been
lost, and it became material to show its condition when delivered

to the Bank of Irwin. When delivered to the Bank of Irwin, the employee in charge tore off a corner of the envelope, inserted his finger and ripped down the end, discovering soft mucilage which adhered to his finger. After the theft was discovered, the package was, at different times, in possession of a special agent of the express company, officers of the Des Moines bank, and a bonding company. The special agent testified that, when he first saw the package, the paper under the seal of the envelope was smooth, clean, and with no appearance of having been tampered with. At one time the package was taken to Chicago, and later expressed back to Des Moines. The Bank of Irwin brought suit against the express company to recover the loss, and on the trial of that cause, some five months later, one of the attorneys for the bank carefully examined the package. At the instant trial, it was shown that the package was in substantially the same condition at the time of the trial of the Bank of Irwin v. Express Company, as it was when received by the Bank of Irwin, all the persons having possession thereof, after the theft was discovered, testifying in relation thereto. *Held*, it was error to refuse to permit the attorney in the instant trial to testify as to the condition of the package at the time he examined it. *Held*, also, the foundation for the testimony of the said attorney was sufficiently shown.

**EVIDENCE: Relevancy, Materiality and Competency—Condition of Rifled Money Package—Foundation.** The foundation for the introduction of relevant evidence in regard to the condition of an object or thing at the time in issue is sufficiently shown by evidence that the condition of the said object or thing at the time witness acquired his knowledge, and at the time in issue, was substantially the same. So held in regard to the condition of a rifled money package.

PRINCIPLE APPLIED:  See No. 3.

**APPEAL AND ERROR: Review—Excluding Question—Sufficient Showing as to Evidence Sought.** Counsel who has his question excluded must see to it that the record shows what evidence was sought to be elicited by the question. This may sufficiently appear (a) by the form of the question itself, or (b) by counsel's statement as to what he expects to elicit. In instant case, *held*, the question sufficiently indicated the evidence sought.

PRINCIPLE APPLIED:  (See facts under Nos. 2 and 4.) The question asked the witness in instant case was ''Will you now describe to the jury the condition of the envelope as it appeared or when you examined it?''

SALINGER, J., dissents as to the application made of the principle.

*Appeal from Polk District Court.*—JAMES P. HEWITT, Judge.

MONDAY, MAY 17, 1915.

REHEARING DENIED TUESDAY, SEPTEMBER 26, 1916.

OPINION states the facts. Trial to a jury, verdict and judgment for the plaintiff. Defendant appeals.—*Reversed.*

*Clark, Byers & Hutchinson,* for appellant.

*Lyon & Lyon, T. J. Fitzpatrick, Parker, Parrish & Miller* and *A. G. Rippey,* for appellee.

GAYNOR, J.—The following facts appear without dispute in this record: That on or about the 20th day of October, 1902, the defendant bank, through Robert Macartney, one of its agents, a receiving teller, delivered to one W. A. Merril, one of defendant's agents, at the office of the plaintiff, in the city of Des Moines, a sealed package for transmission, consigned to the Bank of Irwin, at Irwin, Iowa; that, at the time the package was delivered by Macartney to Merril, there was endorsed thereon what the contents of the package purported to be, to wit, $2,000 in currency. The plaintiff accepted the package and undertook to transmit it to the consignee, believing at the time that it contained $2,000, and issued its receipt therefor to the defendant bank. The plaintiff claims that it transmitted said package so sealed, in the condition in which it was received, and delivered it at its destination to the consignee at Irwin, Iowa, on October 21, 1902, and plaintiff claims that, within a few minutes after the delivery to the Bank of Irwin, it was opened by one A. McMullen, then in charge of said bank, and, upon being opened, it was found to contain pieces of paper cut the size of national bank currency and of no value whatever. The plaintiff's contention is that the package was in the same condition at the time it was delivered by the defendant to it for transmission as it was found to be

in at the time it was delivered at its destination.  The defendant's contention is that the package, at the time it was delivered to the plaintiff company, contained $2,000 in currency, and that, if it was not received at the Bank of Irwin with the $2,000 enclosed in the package, the $2,000 had been extracted therefrom after it went into the hands of the plaintiff company for transmission.  The cause was tried to a jury, a verdict returned for the plaintiff, judgment upon the verdict, and defendant appeals.

The evidence discloses that, on the 20th day of October, 1902, defendant received from the Bank of Irwin, Iowa, an order by mail for $2,000 in currency, to be shipped to it by express; that, immediately upon the opening of the bank that morning for business, a package was prepared by the paying teller, Richard H. Collins, in one of the regular American Express Company's currency envelopes, and addressed to the Bank of Irwin at Irwin, Iowa, and the amount which was supposed to be contained in the envelope was written on the face, to wit, $2,000; that the envelope was sealed by Collins and delivered to Robert Macartney, the receiving teller; that it was the duty of Macartney to seal the envelope with wax seals bearing the stamp of the bank, three seals being placed on each envelope, one in the center, and one at either end. The envelope was sealed in the ordinary way of sealing letters.  On the same morning, five or six other money packages were shipped by express by the bank, all of which were put up by the paying teller, Collins, and delivered to Macartney. Macartney made up the only other package sent out that morning.  One of the packages so made up was to go out over the United States Express, and, in order to get the package to this express office in time to catch the first train, Macartney was unable to seal all the packages of currency which he had for shipment, before going to the United States Express office. He went to the United States Express office and was absent from the bank about 10 or 15 minutes, during which time the

other money packages, sealed and unsealed, were left lying on
the counter in his cage, next to the paying teller's cage. On his
return, the remaining packages were sealed, including the one
in controversy, after which he entered the record of the several
packages in the book kept for that purpose, and then went
to the plaintiff's office, about 9:15 A. M., and delivered the
package in controversy to Walter A. Merril, plaintiff's agent.
At the time the package was delivered to Merril, it was sealed
in the manner above described, and Macartney received from
Merril the receipt of the express company for the package,
purporting on its face to contain $2,000. Merril had no
knowledge of the contents of the package other than was
stated on its face. The package did not reach the office of the
plaintiff company in time to go out on the morning train, and
was held in Des Moines until evening of October 20th, and
Merril claims that during that time the package was kept by
him in a combination stationary safe, he being the only one
having the combination; that, about 6 o'clock that evening,
Merril delivered the package, as he claimed, in the same con-
dition in which he received it, to Stanley F. Howard, who, at
the time, had charge of the depot for plaintiff company.
Howard claims that he examined the seals on the package,
found them intact, apparently in perfect condition, and re-
ceipted to Merril for the same; that, about 8:30, Howard
delivered it to E. W. Jacks, the express company's messenger
running between Des Moines and Tama, taking Jacks' receipt
therefor, and that it was in the same condition then in which he
received it from Merril. Jacks claimed that he examined the
seals when he received the package, and they were in perfect
condition; but he says that, while it appeared to be in perfect
condition, he noticed that the edges seemed very sharp, and,
in signing his name on the package, his signature looked like
dotted marks; that the surface of the package was rough; that
he carried the package to Ames in the same condition in which
he received it, and delivered it to E. W. Rutherford, who was
the night transfer man for the plaintiff company at that place.

Rutherford receipted to Jacks for the package. He says that he then examined the package and found the seals intact, and found nothing to indicate that the package had been tampered with; that he received the package about 11:10 P. M., and held it until 4:10 the next morning, at which time he delivered it to Henry Marsh, express company's messenger running from Chicago to Omaha; that Marsh, when he received it, placed the package in a stationary safe and locked the safe. Marsh testifies that he carried the package as far as Carroll, where the agent Creed entered the car, placed the dial on the safe, and, after the padlock was removed by Marsh, the safe was opened and the package handed to Creed.

Creed testifies that he saw there were three seals on the package when it was handed to him; that, when it was received by him, he took it in a portable safe across the platform to the train going south, and handed it to the express agent on that run about 5 or 10 minutes after he received it; that he received it from Marsh about 5:50 A. M. Creed testifies that he turned it over to one Slater, the express agent for the plaintiff running between Carroll and Audubon. This was the first run for Slater, the first day he worked for the company as messenger. In the car with Slater at the time was another express messenger by the name of T. J. Powell, whose run was from Manning to Harlan, but who lived at Carroll and dead-headed it from Carroll to Manning.

Slater testified that he placed the package in a portable safe; that it remained there, except that at one time he took it out for checking purposes, at which time he examined and found the seals in good condition, the seals unbroken, the glue on the envelope, and not open in any manner, and it seemed to be intact. When they reached Manning, Slater testifies that he delivered the package to T. J. Powell, who had the run from Manning to Harlan. Powell receipted to Slater for it, and he testifies that he examined the seals; that they were in good condition, and were not cracked or broken, and the package was not loose where the glue fastened.

Irwin is the second stop after leaving Manning. Upon reaching Irwin, Powell claims that he delivered the package to one Peter Nelson, who was the agent for the express company at Irwin. Nelson receipted for the package. Nelson testifies that he examined the seals, looked to see if the messenger's signature was on the package; that the seals were all right, were good seals, and Powell's name was on the package; that, after attending to some duties, he took the package to the Bank of Irwin where he found Allison McMullen, son of the cashier, in charge of the bank. That was about 20 or 25 minutes after he received the package. He delivered it to McMullen and took his receipt therefor, and returned to his duties at the depot; that a few minutes afterward, McMullen came to the depot and told him that when he opened the package he found it contained only slips of paper. There was no currency in the package. Nelson then returned to the bank and was given the package and its contents.

McMullen testifies that, at the time he received the package from Nelson, he examined it, looked at the seals; that they were intact and apparently in perfect condition. Thereupon, Nelson notified plaintiff company. It appears that thereafter the Bank of Irwin brought suit against the express company, and in that suit obtained judgment against the company, which was subsequently paid by the plaintiff herein.

Powell testified, in addition to what is hereinbefore stated, that, at the time he turned the package over to Nelson, he noticed that the package had marks on it that looked like dirt; that it had been handled with dirty hands; that it looked bulky and out of proportion.

Mr. Collins, testifying for defendant bank, said:

"I put up the money in the envelope, $2,000, and sealed it with gum or glue and turned it over to Mr. Macartney. Handed it to him through a little gate between our cages. He was standing in his cage facing me, waiting for these orders. After Macartney received the package, he sealed it with sealing wax and put on the impression of the bank seal.

This sealing place was about 8 or 10 feet from my cage and in full view of my cage. I directed the envelope and wrote on it, 'Bank of Irwin, Irwin, Iowa.' I delivered the package to Macartney before he took it to the express office. He made one trip to the United States Express office before he took the Irwin package. While he was gone to the United States Express office, the Irwin package was lying on his desk, was in plain view of my cage from the time he went until he returned. No one entered his cage during his absence. The package was made up probably of 5's, 10's and some 20's. From the time I went into the bank that morning until the package was taken by Macartney to the office, there was no one entered my cage or Macartney's cage. In putting the money in, I simply took an envelope, wet the mucilage on the flap with my tongue and folded it over that way, and stuck it together and handed it to Macartney. The package, after I put it up, was not handled by any other person but Macartney and myself, until he took it from the Des Moines National Bank to the express office.''

Macartney testified substantially the same as Collins, and further testified that he did not take any money out of the package that was addressed to Irwin, nor did anyone else, to his knowledge, after it was delivered to him; that he delivered it to plaintiff express company in the same condition in which he took it from the bank.

Allison McMullen testified that, when Peter Nelson delivered to him the package in question, it contained no money; that, in opening the envelope that was supposed to contain the money, he tore off the upper left-hand corner first, just a small corner, and then ripped down the edge with his finger; that he then reached in to pull out the money, and pulled out paper instead; that, as he tore the envelope down the edge, the mucilage stuck to his finger, and as he pulled out the paper the mucilage stuck to the top of the thumb,—it was soft enough to stick to his thumb; that he immediately went and informed Nelson; that no part of the seals was broken;

that the slips of paper in the envelope were about the size of bills of currency.

This is practically the substance of all the testimony relating directly to the matter in controversy, and we are asked to say upon this record that a new trial should have been granted on the ground that the testimony still fails to establish plaintiff's contention.

Defendant alleges and urges 18 separate assignments of error, but all are included in three divisions: (1) Error in admission and rejection of testimony; (2) error in the conduct of the trial and in the submission of the case to the jury; (3) error in overruling defendant's motion for a new trial, and permitting the verdict of the jury to stand. We will take up the assignments in the reverse order.

Did the court err in refusing to set aside the verdict and grant the plaintiff a new trial? The burden of proof in this case rested on the plaintiff, and, to entitle the plaintiff to recover, it was necessary that it establish its claims and contention by a preponderance of the evidence. The court, in its instructions to the jury, said that they are the judges of the credibility of the witnesses and the weight to be given to their testimony; that, in weighing the testimony of each witness, they should take into consideration his age, intelligence, strength of memory, means of knowledge, his relation or feeling towards the parties, his interest, if any, in the result of the suit, his demeanor while testifying, the reasonableness or unreasonableness of the matters testified to, whether corroborated or contradicted by other witnesses. The jury was told that the phrase ''preponderance of the evidence'' means in law simply the greater weight of the evidence, and the weight of the testimony was for the jury in determining where the preponderance of the evidence lies. If the jury believed that the plaintiff's contention was true; that the package delivered by Macartney to Merril was transmitted

1. APPEAL AND ERROR : review : evidence : unsupported theory : fair question of fact.

over the plaintiff's lines through the hands of its different agents; and that the package was not tampered with or money extracted from it during its transmission; and that, when it reached Irwin and came into the hands of McMullen, it was in the same condition in which it was at the time it was delivered by Macartney to Merril, and that it then contained no money, the jury would be justified in believing that there was no money in the package at the time it was delivered by Macartney to Merril.  On the other hand, if the jury believed that, at the time Macartney delivered the package to Merril, it did, in fact, contain the money claimed to have been placed in it by Macartney, and that, thereafter, it was found not to contain the money, the jury would be justified in concluding that the money had been removed from the package sometime after it had reached the hands of Merril on its way to Irwin.

The witnesses for the parties were before the jury and the court.  They heard them testify; had an opportunity to observe their demeanor upon the stand; the manner of their testifying; the apparent fairness or candor exhibited in giving the testimony; the consistency or inconsistency of their entire evidence.  They had a right to give to the evidence of any witness testifying before them greater weight than to another, who, upon this record as it is before us, would seem to have equal weight.  The jury was the judge of the credibility of a witness and the weight to be be given to his testimony.  It was the duty of the jury to weigh the evidence, balance and adjust it to the cause, and to sit in judgment upon the credibility of the witnesses, and to give to their testimony such probative force on the issue tendered as, under all the facts and circumstances disclosed, the jury believed it entitled to receive.  This case presents a conflict of evidence upon the ultimate issue, which the jury was required to settle. There were facts and circumstances disclosed in the examination of the witnesses which, thrown into the balance, might justly tip the scales of justice in favor of one party or the

other. These facts and circumstances we have not set out in this record, for the reason that, in view of a new trial (which we find must be granted for reasons hereinafter stated), we do not care to enter into the discussion of the evidence, or express any opinion as to the weight of the evidence or the credibility of the witnesses.

The defendant's contention that a theory cannot be established by circumstantial evidence, even in a civil case, unless the facts relied upon are of such a nature and are so related to each other that it is the only conclusion that can be reasonably drawn from them, and that it is not sufficient that they be consistent merely with the theory, does not apply in this case. The evidence is not wholly circumstantial. The evidence is direct and to the point as to the existence of facts which, if believed to be true, are sufficient to maintain either theory of the case; but the weight of the testimony that establishes these facts and the credibility of the witnesses who testified to these facts, are for the jury.

The cases relied upon by defendant are cases in which a party on whom rests the burden of proof has adopted a theory upon which he predicates his right to recover, and introduces circumstantial evidence to establish the theory that if, in establishing his theory, the evidence which he offers is just as consistent with some other theory upon which liability does not rest as it is upon the theory contended for, he has not proven the theory upon which he rests his right to recover. If the evidence offered by him to support his theory, when fairly and honestly considered, is just as consistent with the theory upon which no liability rests, it cannot be said that he has proven his theory upon which he predicates liability. This is the doctrine of *Asbach v. Chicago, B. & Q. R. Co.*, 74 Iowa 248, and kindred cases.

In this case, plaintiff predicates upon a theory its right to recover. If plaintiff's evidence is true, it establishes its theory and affirms liability. If the defendant's testimony is believed

to be true, it negatives plaintiff's theory and denies liability. It is here simply a conflict in the evidence—a case in which the jury is required to weigh and balance the evidence and sit in judgment upon the credibility of the witnesses.  Where there is evidence to support the plaintiff's theory, more than a scintilla, we cannot interfere, even though in our judgment we should conclude that the preponderance of the evidence was on the other side.  We think the court did not err in overruling the motion for a new trial.

It is next contended that there was error in the conduct of the trial, and in the submission of the case to the jury. This error is predicated upon the thought that it was the contention of the plaintiff that the money supposed to have been contained in the package had been removed by one Carl M. Spencer, or that the package, as prepared by Collins and delivered to Macartney, had been surreptitiously removed by Spencer, and the package which was afterwards delivered to the plaintiff, substituted in lieu thereof.  To this end, the plaintiff sought to establish a relationship between the package and Spencer, and sought to show that Spencer had been subsequently convicted of embezzling money belonging to the bank, from which an argument was to be adduced that Spencer was the wrongdoer in the transaction, and, at the time, was in the employ and under the control of the defendant.  Inasmuch as the plaintiff failed to show that Spencer had anything to do with the handling of the package, or was in a position to have substituted one package for another, the court excluded as immaterial all testimony tending to show that Spencer was a defaulter, or that he was dismissed from the service of the bank.  After several efforts on the part of the plaintiff had been made to get this testimony before the jury, and after the court had ruled adversely to the plaintiff, the jury was excused, and, in the absence of the jury, the plaintiff offered to prove as a fact

2. EVIDENCE: relevancy, materiality and competency: necessity for foundation: theft by employee.

that Spencer was a defaulter, and that settlement had been made between him and the president of the bank; that. Spencer was convicted of being a defaulter. The only offer that it made to connect Spencer with the transaction in question was that he was employed in the bank at the time the packages were made up, and that it was possible for him to enter the cage of Macartney and substitute a bogus package for the one that was put up by Collins. The court, in the absence of the jury, said:

"It seems to the court that, unless the plaintiff expects to show by some proper competent testimony that Mr. Spencer was in the same way connected with this transaction, or at least to show something more than the mere fact that he was employed in the bank and would have been or might have been a physical possibility for him to have substituted one package for another, that we could not permit the jury to base a finding upon testimony of so uncertain a character, problematical, pure conjecture, without any real tangible testimony to support it. Of course, if it was in any way connected with this transaction, or it appeared that Mr. Spencer handled this fund, or put it up or had anything to do with it, or there was direct testimony from which the jury might infer that fact, it would be a circumstance to go to the jury with other testimony bearing upon the question; but in the absence of that, it seems to me that the jury should not be allowed to base a finding upon a mere possibility, without some tangible evidence. The objection will be sustained."

This ended the controversy between the parties on this subject. We think the plaintiff was within its right in seeking to make the proof offered. We think, however, that the court was right in excluding it for want of proper foundation to rest it upon. All the offer that might have been prejudicial to the defendant was made in the absence of the jury.

Defendants further contend that the court erred in excluding testimony offered by the defendant in the following

respect.   It was material to show to the jury what condition the package was in at the time it was deliv-

**3. EVIDENCE: relevancy, materiality and competency: condition of rifled money package.** ered at the Bank of Irwin.   It appears from the testimony of Nelson that, after he received the package from McMullen, he notified the plaintiff company, and that one Mr. Finch, representing the company, arrived at Irwin the next morning, and that Nelson turned the package over to him in the same condition in which he received it from McMullen.   Finch testified that, when he received the package, he removed the contents, examined the package carefully and found the paper under the seal in perfect condition; that it was smooth and clean and had no appearance whatever of having been tampered with in any way; that he afterwards interviewed all the agents through whose hands the package passed, and then went to Des Moines, took the package with him and interviewed the plaintiff's clerks at Des Moines and showed them the package; that, while in Des Moines, he visited Mr. Arthur Reynolds, the president of the bank; that Mr. Reynolds, Mr. Hartshorn and Mr. Zwart examined the package very carefully, using a small magnifying glass; that they went from there to the bonding company, and from there Mr. Hartshorn took the package to Chicago.   Ten days or two weeks later, he saw the same package again in the Des Moines National Bank in the possession of Mr. Reynolds.   Mr. Reynolds testified:

"I first saw the package in controversy at my residence when Mr. Finch brought it back.   I examined it later at the bank.   The package was afterwards received by our bank by express and I examined it at that time.   Mr. Zwart and Mr. Macartney were with me.   The package was in the same condition when I saw it the second time as it was when I saw it the first."

Finch further testified:

"I got the package at Irwin.   First received it from

Peter Nelson, and I kept the package in my possession until
I came to Des Moines and had it here in Des Moines, and
there was no material change in the package during that time.
I gave it to Mr. Hartshorn.''

Allison McMullen testified:

''I gave the envelope and its contents to Mr. Nelson. I
do not remember of seeing it again until the trial at Harlan
in 1903. I examined the package at the trial of the Bank of
Irwin against the American Express Company, so that I could
say it was the same package and in about the same condition
in which I turned it over to Mr. Nelson.''

George T. Lyon, attorney for the plaintiff in the case,
testified on this trial:

''It was our firm that had charge of the defense in the
case of the Bank of Irwin against American Express Com-
pany. We have made search for the envelope and package
that was used in the trial at Harlan, and were unable to find
it. I wrote to the clerk of the court at Harlan and received
a letter from him in which he said that he was unable to find
the exhibits·used at Harlan; that he had made search in his
office at home carefully; that the exhibits were not now in the
possession of the attorneys for the plaintiff company.''

It seems to be conceded that this package was not pro-
duced on the trial in this case; that it was lost or mislaid and
could not be produced.

H. W. Byers was called in behalf of the defendant, and
testified as follows:

''I live in Des Moines; formerly lived and practiced law
at Harlan. I was one of the attorneys for the plaintiff in the
case of the Irwin Bank against the American Express Com-
pany, tried at Harlan in March, 1903. I saw and examined
a package or an envelope that was said to have contained
$2,000 in currency; the package was there used in that case.
The envelope I examined was in general character such an
envelope as Exhibit 3, handed me. I made a careful exami-
nation of the envelope said to have contained $2,000 in cur-

rency, addressed to the Irwin Bank at Irwin, Iowa, in that trial.''

He was thereupon asked this question: ''Will you now describe to the jury the condition of the envelope as it appeared or when you examined it?'' which was objected to by the plaintiff as incompetent, irrelevant and immaterial, and the objection sustained on the ground that it was not shown that the package was in the same condition at the trial at Harlan that it was when it arrived at Irwin. On this action of the court, the defendant predicates error.

When we see that the record discloses that this package was in substantially the same condition at the time it was produced at the trial at Harlan as it was at the time McMullen delivered it to Nelson; that it continued in 4. EVIDENCE: relevancy, materiality and competency: condition of rifled money package: foundation. the same condition in all the hands through which it passed up to the time of that trial; that it was examined by this witness minutely and carefully at that trial; that, at the time, he represented the Irwin Bank as its attorney, it becomes apparent that his testimony was not only relevant and material to the issue, but that a foundation was laid for its introduction. The condition that package was in, at the time it was delivered by the plaintiff company to the Irwin Bank, was very material on the issue as to whether it was delivered to the bank in the same condition in which it was received by the plaintiff company. McMullen described to the jury what was done with the envelope after he received it, and the condition in which it was when he delivered it to Nelson. The material fact was not what the condition was at the time of the trial at Harlan, but what was the condition at the time it was delivered by McMullen to Nelson? If it was in the same condition at the time of the trial that it was at the time it was delivered to Nelson, a showing of the condition at this time had probative force in showing what the condition was at the time it arrived at Irwin. The question was a proper one; the foundation had been laid for the question;

it called for testimony relevant and material to the issue; therefore, the witness should have been permitted to answer the question. As said in *Mitchell v. Harcourt,* 62 Iowa 349:

"The true rule, we think, is that, when it is apparent on the face of the question asked the witness what the evidence sought to be introduced is, and that it is material, this is sufficient."

The cases which hold that the party seeking to introduce the evidence is required to state what he expects to prove, and thus make its materiality appear, are not inconsistent with this rule. This rule announces the

5. APPEAL AND ER-      proposition that where, upon the whole rec-
ROR : review : ex-
cluding ques-       ord, it is apparent that the evidence sought
tion : sufficient
showing as to       to be elicited is competent, relevant and
evidence sought.
material to the issue, and is offered under

such circumstances that the court can plainly see that the admission of it would be helpful to the cause of the party offering it, it is not necessary that it be stated in the record what it is expected the answer should be; and therein lies the distinction between the rule laid down in *Emerick v. Sloan,* 18 Iowa 139; *Jenks v. Knott's M. S. M. Co.,* 58 Iowa 549; *Shellito v. Sampson,* 61 Iowa 40; *State v. Row,* 81 Iowa 138; *Porter v. Moles,* 151 Iowa 279, and *Arnold v. Livingstone,* 155 Iowa 601.

For the error in excluding this testimony, the cause must be reversed and is—*Reversed.*

EVANS, C. J., DEEMER, LADD, WEAVER and PRESTON, JJ., concur.

SALINGER, J. (dissenting).—The majority reverses because an objection to a question was sustained. There is no statement in the record making claim as to what answer would have tended to prove had answer been allowed. An unbroken line of our cases, beginning with *Lawson v. Campbell,* 4 G. Gr. 413, and ending with *Arnold v. Livingstone,* 155 Iowa 601, at

604, and numberless decisions in other jurisdictions, establishes the following propositions:

If complaint is that answer was received, the record must show what answers, or what they tend to establish.

If answer is refused, the record must indicate, by statement of counsel, what it is claimed was excluded.

If the character or effect of what it is claimed was excluded is not so shown, no error is established.

The record must show that the excluded matter was material, competent and relevant.

Unless the record refutes the presumption that the lower court acted rightly, there is no proof that error was committed.

Prejudice will not be presumed from refusal to let a question be answered, and every presumption will be indulged in favor of the ruling below.

An appellate court will not presume a state of facts in order to find error.

In one word, these cases all hold that the record must show affirmatively that prejudicial error was committed, and that this is not done, and, therefore, there can be no review, where it is not thus shown what was excluded and that its exclusion is prejudicial, or what complainant proposed, sought and expected to elicit. And, while these cases differ on why such showing must be made, they all agree its making is a condition precedent to review. In applying the rule, it has been held that, if the offer is for a stated purpose, it will not base error that what was offered was admissible for some purpose other than the one announced. *Gustafson v. Rustemeyer* (Conn.), 39 Atl. 104; *Maxwell L. G. Co. v. Dawson* (N. M.), 34 Pac. 191; *Feary v. O'Neill* (Mo.), 50 S. W. 918. In *Chicago & I. Coal R. Co. v. De Baum* (Ind.), 28 N. E. 447, at 449, left column, this is amplified by holding that the offer of proof comes too late after objection is sustained, because "the court was entitled to be informed before making its ruling what answers were expected to be elicited."

In effect, then, the basis of this rule of appellate review

is this argument: (1) Without such showing, the question presented for review may be wholly academic and moot. (2) The offer making such showing might change the ruling; wherefore, if offer be dispensed with, one who, on appeal, complains of exclusion might be complaining of an act of the trial court which he might have prevented.

It may well be said that there is no conflict in authority upon either the rule or the reason advanced in its support. The majority concedes both. It may be suggested that making the offer of proof is cumbersome and may delay trial. But, as the cases that require the offer are not challenged, this is not a valid objection. For, in spite of that possible delay, these cases do insist upon the offer. The difference arises on whether, upon the facts in the instant case, something other than what is known as offer of proof will base review. The majority plants itself on the following propositions: (1) "The question was a proper one. The foundation had been laid for the question." (2) "It called for testimony relevant and material to the issue." (3) A showing made by a statement in the record of what it is expected or proposed to be proven is not the only basis upon which appellate review of the exclusion of testimony may be had.

I. If, before reversal for excluding evidence, it must be made to appear that the giving of a material answer was prevented, a statement that "the *question* was a proper one; the foundation has been laid for the question," neither supplies nor waives proof that a material *answer* was stopped. That an interrogatory is "proper," and that there is foundation for putting it, is not the slightest evidence that an answer to it which was never uttered would have been material, had it been uttered. It is illustrative that we held, as early as the case of *Mays v. Deaver*, 1 Iowa 216, at 223, that showing an *improper question* is of no avail without a showing that the *answer* was improper and illegal testimony, prejudicial to the. appellant.

If there be reversible error here, it is neither created nor

proven by the fact that a proper question and one resting on foundation was asked.   If such error there be, it is that the complaining party was wrongfully deprived of the benefit of an answer, and thereby lost some advantage to which he was entitled.

II.   The majority attaches importance to its claim that the question "called for testimony relevant and material to the issue."   I must discuss elsewhere whether there is anything to indicate that evidence of that kind was "called for." Concede it for present purposes, and, as I see it, this affords no proof that testimony of that character would have been furnished, had response to the call been allowed.   The bench and bar know it to be a truism that questions which pointedly demand material and relevant testimony are often answered so that the answer is rightly stricken out because nonresponsive and immaterial and irrelevant.   The essence of the opinion is that, while there can be no review unless there be a showing of what was lost by the exclusion, and while these cases hold that the showing must be made by an offer of proof, other cases permit such showing to be made by means of something other than such offer; that this appeal is to be disposed of by applying the statement in *Mitchell v. Harcourt*, 62 Iowa 349,—"When is it apparent on the face of the question  .  .  .  what the evidence sought to be introduced is, and that it is material, this is sufficient."   So far as this court is concerned, this "rule" is of dubious standing.   The only case in which I can find it to have been applied is *Mitchell's* case.   That case very clearly points out that, if the question had been answered in a stated way, it would be material, and why.   But, unfortunately, it is wholly overlooked that there is no evidence in its record which indicates that the question *would* have been answered in that way, or how it would have been answered.   The case simply assumes that a certain answer would have been made, and thus begs the question. It has never been cited in any case where its rule has been applied.   *Votaw v. Diehl*, 62 Iowa 676, at 680, cites it, but

refuses review, though the question asked in it is more suggestive of the answer which might be expected than is the one in *Mitchell's* case.    It is also cited in *Kuhn v. Gustafson*, 73 Iowa 633, at 637.    The *Kuhn* case also refuses to apply the doctrine of the *Mitchell* case, and declines review, though, again, the question is at least as suggestive as is the one in the *Mitchell* case.    The only other citation of it is in *Porter's* case, 151 Iowa 279, at 281; another case in which offer of proof was held necessary, and wherein, once more, the question was more suggestive than the one in *Mitchell's* case.

There is nothing harsh or unreasonable in requiring those who wish to reverse for an exclusion to advise the trial court why they claim it will work prejudice should exclusion be ruled.    If this is insisted upon, definite rules will govern review of exclusions.    On the other hand, encouragement of the so-called rule in *Mitchell's* case will, in practice, result in having appellate courts review exclusions by a species of judicial rule of thumb.    The natural tendency would be for them to proceed in one case contrary to the rule in *Shellito v. Sampson,* 61 Iowa 40, and "imagine the testimony that would have been given and thus presume prejudice," and in another case to use imagination to the opposite end.

III.    But concede the alleged rule.    What does the majority say it is?    The rule in *Mitchell's* case is:

"When it is apparent on the face of the question asked the witness what the evidence sought to be introduced is, and that it is material, this is sufficient."

After approving this, the opinion makes this statement:

"The cases which hold that the party seeking to introduce the evidence is required to state what he expects to prove, and thus make its materiality appear, are not inconsistent with this rule.    This rule announces the proposition that where, upon the whole record, it is apparent that the evidence sought to be elicited is competent, relevant and material to the issue, and is offered under such circumstances that the court can plainly see that the admission of it would be helpful

to the cause of the party offering it, it is not necessary that it be stated in the record what it is expected the answer should be; and therein lies the distinction between the rule laid down in'' the cases which require a statement of what counsel expects to prove, and thus make materiality appear.

So the opinion concedes that it must be made to appear what the exclusion was and that it worked prejudicial error, but holds that this may be established, not alone by an offer of proof, but as well by the means specified in the opinion. In any view, this works no change in *what* must be shown, but merely adds a method of proof. Whether the rule which the majority would apply is sound becomes a needless inquiry if the showing made is insufficient under the standards of that rule. In the rough, the pronouncement of the majority compels an inquiry whether, either by what appears on the face of the question asked or by the whole record, it has been made to appear that a harmful exclusion has been ruled. This requires consideration of what is the face of the question, and of what is that ''whole record'' from which it is to be found, if at all, that the exclusion was prejudicial.

The defendant, Des Moines National Bank, procured the express company to ship a package claimed to contain a sum in bank bills to the Bank of Irwin. When opened by McMullen, the cashier of the Irwin Bank, the package was found to contain mere slips of blank paper. The Irwin Bank, on account of this, got judgment against the express company. The present suit is that of the express company against the bank which shipped to the Irwin Bank. The express company got judgment, a decision that the package contained no money when defendant delivered it to the carrier. In this last suit, it appears without dispute that, when the package was delivered to McMullen, cashier of the Irwin Bank, he tore off a small corner of the upper right-hand side of the envelope. Then he ripped down the edge, reached in to pull out the money, and pulled out paper. As he tore down the edge, mucilage stuck to the top of his thumb. Mr. Byers, who was

an attorney of the Irwin Bank in its said suit, was a witness in the instant suit. He testifies that, on the trial of the suit by the Bank of Irwin in 1903, witness made a careful examination of the package, and that an envelope now handed him was in general character like that package. He was then asked: "Will you now describe to the jury the condition of the envelope as it appeared, or when you examined it?" Objection was sustained that this was incompetent, immaterial and irrelevant. It is for this that the majority would reverse. It was shown that the package examined in 1903 is lost, and that, when examined in 1903, it was in the same condition as when the cashier, McMullen, after opening it, as aforesaid, returned it to Nelson, the Irwin agent of the express company. The opinion concedes that it is not material what the condition of the envelope was when examined in 1903, except as, by the showing that it was then as it was when McMullen returned it to Nelson, its condition in 1903 shows what that condition was at the earlier time when it was returned to Nelson.

Paraphrased, the majority holds, it appears, either by the face of the question or by the record as a whole, that, had answer been allowed, the witness could and would have given such description of the condition in which the package appeared when McMullen returned it to Nelson as that it may reasonably be claimed that it might have changed the verdict.

### 2.

What is there in this record that makes it "apparent on the face of the question asked what the evidence sought to be is and that it is material?" The witness is asked whether he will describe the condition of the envelope as it appeared when he examined it some years before. How does the "face of the question asked" make it apparent what the evidence sought to be introduced is and that it is material? Manifestly, any description witness was able to give would be a sufficient answer to anything indicated by "the face of the question

asked." Therefore, the face of the question is absolutely no indication what the evidence sought to be introduced is. Manifestly, the face of the question offers no evidence that the evidence sought to be introduced is material. For the giving of any description would answer the question, and we surely may not assume that any and every description the witness might have given would have been material. As is said in *State v. Row*, 81 Iowa 138, 144, "There might have been an answer not open to the objections, and it is equally true that there might not."

"The whole record" is that the witness saw an envelope some years before, which was then in the condition it was in when the cashier returned it to the express agent. We said, in *Paddleford v. Cook*, 74 Iowa 433, at 435, and *Arnold v. Livingstone*, 155 Iowa 601, at 604, that it must be made to appear that the witness was able to answer. In *Shellito v. Sampson*, 61 Iowa, at 41, we hold that, without something to indicate the nature of what was lost, there is no way by which the appellate court can determine whether error was committed at all, or, if committed, whether it was prejudicial— and that the appellate court cannot, and should not be asked to, "imagine the testimony that would have been given, and thus presume prejudice." It must be shown that witness would not have said that which amounts to nothing—*Mosier v. Vincent*, 34 Iowa 478, at 480—and what testimony was proposed to be elicited which would have been of advantage to the interrogator—*Klaman v. Malvin*, 61 Iowa 752. It must appear that answer received or refused was not of such character as to be injurious to the theory of the one who complains of the ruling—*Mays v. Deaver*, 1 Iowa 216, at 225. Surely, it is possible that, if he had been allowed to speak, the witness might have said he no longer remembered. Surely, there is nothing in the record to show that he would not have thus testified. That one made a careful examination of a package in years past is no evidence that he is still able to describe the appearance of the package at that past time.

In *Arnold's* case, 155 Iowa, at 607, it is said:

"If we were to reverse this case upon this ground and remand it for the purpose of permitting these questions to be answered, the answers might prove to be wholly negative. This is illustrated in this record [by the fact that one question which was allowed to be answered] proved to be a pure negation. If the trial court had sustained an objection to such question, and if we were to reverse upon such ruling, such reversal would be based upon an imaginary error and not a real one. The reversal would be rendered farcical by a subsequent negative answer, and it would be none the less so though the answer were affirmative, if such answer could not change the final result."

Again, suppose he did remember and was able to state how the package appeared to him at the time he examined it. How does the record indicate that the description given by him would not have been injurious to the theory of the party calling him? Again, it does not appear in the record what was the appearance of the envelope at the time when McMullen returned it to Nelson. At that time, the seals were intact; McMullen had torn off one corner of the envelope, slit open one edge, and found soft mucilage in or upon the envelope. Byers did not see it at that time. Evidence that, up to the time when he did see it, it remained in the same condition, simply made any description he could give a description of the condition when McMullen returned the opened envelope. If we are to indulge presumptions, they must be that Byers would have said that, when he examined the envelope it looked as it did when McMullen returned it to Nelson, and as to its condition at that time there is no dispute. Surely, the exclusion of testimony which would be a mere repetition of undisputed testimony is not prejudicial error. So that we have a case of a record showing that exclusion was harmless, instead of proof that same was prejudicial. At all events, neither the question nor the record as a whole indicates that Byers would have given a description materially different from the

evidence of eyewitnesses who saw the package at the very time in inquiry. What is there upon such "whole' record" that makes it "apparent that the evidence sought to be elicited is competent, relevant and material to the issue?" What is there about such a record that indicates that any evidence "is offered under such circumstances that the court can plainly see that the admission of it would be helpful to the cause of the party offering it?"

### 3.

. Turning, now, from an analysis of what this record presents by way of warrant for reviewing the exclusion at bar, one may with profit review the cases in which unsuccessful attempts were made to do what the majority here sanctions. Time and again have appeals been presented in which, upon a record whereon it could much more naturally be inferred what had been excluded, and what was the effect of the exclusion, than can be done on the record at bar, review was refused; because, while it was possible to make a fairly good guess as to what had been shut out by the ruling complained of, that was held not to be enough for the certainty required, and that the point must fail because there had been no offer of proof. Concede a rule which enables review if the form of the question or the "whole record" indicates what testimony is proposed, surely, the interrogatory at bar is no such an one, if the following cases are authority. Surely, the questions in those cases were much more suggestive than is the question now in review. In *Kelleher v. City of Keokuk*, 60 Iowa 473, at 475, a suit for injury from a defective sidewalk, a carpenter who had built it, and who had shown that he knew how long stringers put there would remain in condition to hold nails, was not allowed to answer in what time those very stringers would become rotten and incapable of holding nails. In *Mordhorst v. Nebraska Tel. Co.* (Neb.); 44 N. W. 469, at 470, there was an attempt to recover for telephone rental, and defense that the instrument put in was worthless,

But objection was sustained to the question what kind of an instrument it was as to being good or poor. In *Sellars v. Foster* (Neb.), 42 N. W. 907, at 909, a witness whose testimony that one Huston's reputation for truth was bad had been stricken out, was afterwards asked as to that reputation by a question proper in form, and refusing to let him answer was held to be not available on appeal. In *Cutler v. Skeels* (Vt.), 37 Atl. 228, at 230, a witness was not allowed to answer whether he did not know better than to approach a judge and try to influence him. In *Gronan v. Kukkuck*, 59 Iowa 18, at 20, a suit for damages for assault, objection was sustained to the question whether it was in any way understood between witness and his father that plaintiff should be assaulted. In *Masters v. Marsh* (Neb.), 27 N. W. 438, a bastardy suit, testimony that complainant was seen going with someone other than the defendant into a house in the nighttime was excluded. In *Yates v. Kinney* (Neb.), 41 N. W. 128, at 129, counsel for defendant in a malicious prosecution was not allowed to say whether his client acted on advice of counsel. In *Klaman v. Malvin*, 61 Iowa 752, the defendant was bound to suffer judgment if other signatures on a note signed by him were genuine, and made the defense that they were forgeries. He was not allowed to say whether he heard the others impleaded say that their signatures were put on by authority. In *Shellito's* case, 61 Iowa 40, 41, the question was whether witness had not, at a stated time talked with a named witness, and then stated that plaintiff had consented to the cancellation of the contract with defendant. In *Jordan v. D'Heur*, 71 Ind. 200, involving the extension of a promissory note, objection was sustained to a question whether consent was given at the time the written consent bears date. In *Porter v. Moles*, 151 Iowa 279, at 280, a suit on an oral guaranty, a witness was not allowed to say what passed between him and defendant respecting future liability on the note. In *Greenough v. Shelden*, 9 Iowa 503, at 506, a written memorandum refused may much more readily be presumed to have contained matter

beneficial to the one desiring its introduction than we can pre-
sume what the witness at bar would have stated: In *Iowa & M.
R. Co. v. Perkins*, 28 Iowa 281, 284, it was much more clear
that an answer was sought as to who had affixed a stamp than
it can possibly be what answer would have been made to the
interrogatory involved on this appeal. And see *Whitehead v.
Mathaway*, 85 Ind. 85; *Votaw·v. Diehl*, 62 Iowa, at 678. In
*Arnold's* case, 155 Iowa 601, there was involved an action to
set aside a will. Plaintiff testified that the talk referred to
in the questions propounded was had about the time the will
was made. Objection that it was incompetent, immaterial
and irrelevant as to undue influence was sustained to ques-
tions whether or not at this time she had a talk with defend-
ants as to what their mother had done or how things had been
fixed, and, if there had been such a talk, to state what was
said, and when. The witness was then asked whether the
same defendant said anything to her as to what the mother
had done with reference to disposing of her property or mak-
ing a will. The same objection was again sustained, with the
further one that this sought to put in the statement of one
legatee to the prejudice of an absent legatee. Like objections
were made and sustained to questions whether, at that time,
the brother of plaintiff said anything to her as to what the
brother and her sister Phemy had done with reference to the
mother's disposing of her property or making a will; and to
a statement by witness that she afterwards heard a talk
between two of her sisters when all were present attending
the funeral; and to a question asked concerning this time at
the funeral, "as to what had been done; what you had caused
to be done with reference to your mother's disposing of the
property." We said, on complaint of these exclusions:

"It is urged by appellant that the questions above set out
were proper, and that the trial court should have permitted
them to be answered. If this contention were sustained, it
would avail the appellant little on this appeal. There is
nothing in any of the questions which brings before us the

particular matter attempted to be proved. The proposed evidence might have been admissible, and yet be insufficient to cure the deficiency in plaintiff's case. We have repeatedly held that we will not reverse a case upon such rulings as are here shown, unless it be made to appear in some manner what the answer of the witness would have been. If we were to reverse this case upon this ground and remand it for the purpose of permitting these questions to be answered, the answers might prove to be wholly negative. This is illustrated in this record [by the fact that one question which was allowed to be answered] proved to be a pure negation. If the trial court had sustained an objection to such question, and if we were to reverse upon such ruling, such reversal would be based upon an imaginary error and not a real one. The reversal would be rendered farcical by a subsequent negative answer, and it would be none the less so though the answers were affirmative if such answer could not change the final result. It was, therefore, incumbent upon the plaintiff to make it appear in some proper way what the purpose of the testimony was or would be."

There was a statement in writing incorporated in the record, and it is said:

"It will be noted that there is nothing in such written statement that throws any light upon the question what the proposed testimony of the witness was to be. All we learn from such writings is that both 'Rodney and Phemy made the same statement.' What was the statement? This question finds no answer in the record. The appellant is, therefore, in no position to ask a reversal upon these assignments."

In *State v. Row*, 81 Iowa 138, 144, defendant and one Campbell were employed in driving teams to deliver and transfer the goods of Hurlbut-Hess & Co.; on one evening both were engaged with teams in delivering goods, and the wagon driven by Campbell had on intoxicating liquors. C. W. Logan, the man killed by defendant, was known as one who made a business of searching liquor unlawfully kept for

sale.   About six o'clock of that evening, Logan and another found Campbell on the streets delivering intoxicating liquors, whereupon Logan arrested him without warrant.   The team was left with one of Logan's assistants, and Logan and Campbell went to the Hurlbut Company's place of business, where Logan inquired if a permit was held authorizing Campbell to make such deliveries.   At this time, defendant came in, and inquired if Logan had a warrant for the arrest of Campbell. Being told that he had none, defendant said, in substance, that Logan had no right to make the arrest without warrant, and told Campbell to go and deliver the goods, giving Campbell a slight push.   Some words passed between defendant and Logan with reference to this interference, and Logan drew his revolver.   Defendant also drew; shot Logan twice, and inflicted a mortal wound.   It was the theory of the State that there was a conspiracy among certain members of the Hurlbut corporation and its employees to resist the effort of officers and others engaged in enforcing the law against the sale of liquor, in so far as such efforts might lead to the seizing of liquors in the building of the corporation, or delivery therefrom to patrons, and that the shooting of Logan was the result of such conspiracy.   One Hall, a witness for defendant, testified that he had for nine years been engaged with the police force of the city, and was thereupon asked:

"State what you heard, if anything, C. S. Logan say in respect to what he would do at the house of Hurlbut-Hess & Co., if he had occasion to go there."

To this, objection was sustained that it was incompetent, immaterial and irrelevant.   A fairly good guess can be indulged in as to what it was proposed to establish by an answer to this question.   It is fairly probable that the expectation was to show that defendant knew of Logan's declaration as to what he would do in the house of the corporation if he had occasion to go there; that the declaration involved a threat, and thus bore upon whether the defendant acted in self-defense, or, rather, whether what he knew of Logan's

declaration impelled defendant to shoot. Yet we said that
the exclusion could not be reviewed, because, though "it is
true there might have been an answer not open to the objec-
tion, it is equally true that there might not." In other words,
we held that neither the form of the question nor the whole
of the record enabled us to judge that prejudicial error had
been committed. Clearly, these demonstrate that, so far as
adjudicated cases speak, the same is true of the question at
bar.

IV. There is absolutely nothing in the record to show
that the witness was able to answer at all, and, if able to
answer, he would have said aught to aid the defendant's
cause, unless we may presume from the fact that defendant
called the witness that, if allowed to answer, he could and
would have given material evidence beneficial to the party call-
ing him. I have been able to find no adjudicated case holding
to such a presumption, and on careful search have found none
except such as deny such presumption. In *Barr v. City of
Omaha* (Neb.), 60 N. W. 591, at 592, it is expressly ruled
that the court cannot presume "that, if permitted, the wit-
ness would have made answers favorable to the party pro-
pounding the questions." To the same effect is *Masters v.
Marsh* (Neb.), 27 N. W. 438. In *Klaman v. Malvin*, 61 Iowa
752, we said: "The record fails to show . . . that the
witness would have testified to any fact of advantage to
plaintiff." In *Kelleher v. City of Keokuk*, 60 Iowa, at 475,
we said, again: "We cannot presume that the witness would
have given evidence beneficial to plaintiff." If we may ever
assume that an unuttered answer would have been favorable
to the interrogatory, it would be where the witness is a party,
or the attorney of the party. Yet we did not so presume in
*Arnold's* case, 155 Iowa, at 604, where the questions were
asked of plaintiff himself. In *Klaman's* case, 61 Iowa 752,
the defendant himself was the witness to whose testimony
objection was sustained. In *Porter's* case, 151 Iowa, at 280,
the question was one propounded to the appellant on his direct

examination. In *Yates v. Kinney* (Neb.), 41 N. W., at 129, it was the defendant and his attorney who were not permitted to answer. This is perfectly sound, because very often a party testifying as a witness testifies to that which destroys his case. If it were presumed that a witness, if allowed to answer, would answer in a way to advantage the one calling and interrogating him, there never could have been a case written declaring that the exclusion of testimony would not be reviewed because there had been a failure to show prejudice. If there exist a presumption that a witness will testify favorably to the party calling him, that presumption would always have supplied proof of prejudice. If the fact that the witness was not allowed to answer is proof that he would have answered favorably if allowed to answer, how was any court ever able to hold that reversal should be denied for want of a showing of prejudice?

Without any reference to or analysis of authority, it should be plain that we cannot have recourse to such a presumption as that. The only presumption that can be indulged is that the witness will tell the truth as he understands it. It would be a judicial scandal to promulgate a judicial announcement that a witness is under a species of implied contract to furnish a memory adequate to the needs of the party calling him, and to answer questions in such way only as will benefit that party.

I would affirm.