MARIE YOCUM, Appellant, v. BOYD HUSTED et al., Appellees.

APPEAL AND ERROR: Presumptions—Exclusion of Evidence—
1 Necessity to Disclose Purpose. Counsel need not *formally* state just what he expects to show by his excluded questions, when the same may be reasonably inferred from the form of the questions, judged in the light of the entire record.

EVIDENCE: Admissions—Acquiescence or Silence. Failure of a par-
2 ty (under circumstances which, in reason, call upon him to assert the truth of a material fact) to either deny or affirm the truth of material and relevant statements attributed to him by a stranger to the litigation, is admissible as an implied admission.

**CONSPIRACY: Civil Liability—Evidence.** On a charge that, at the funeral of plaintiff's husband, the defendants conspired to accuse plaintiff of having caused the death of deceased by criminal means, evidence is admissible to show that such accusation was made; that said accusation was made by all, or by certain of the defendants; that defendants requested that public officials be consulted, prior to going on with the funeral; and that such officials were consulted, etc.

     EVANS and PRESTON, JJ., dissent as to the sufficiency of the evidence to present a jury question, and as to the correctness in form of the questions propounded.

**LIBEL AND SLANDER: Evidence—Defamatory Sense of Words.** The understanding of people as to the sense in which words were spoken is admissible on the issue whether the words were spoken in a defamatory sense.

**PLEADING: Issue, Proof, and Variance—Conspiracy to Slander—Individual Slander.** An averment of a conspiracy to slander will not, on failure of proof of conspiracy, authorize a judgment for an individual slander. (Secs. 3599, 3639, Code, 1897.)

     Note: *See Overstreet v. New Nonpareil Co.*, 184 Iowa 485.

*Appeal from Clarke District Court.*—THOMAS MAXWELL, Judge.

MAY 13, 1918.

REHEARING DENIED DECEMBER 14, 1918.

SUIT to recover damages because defendants engaged in a conspiracy to slander the plaintiff. The defendants are jointly impleaded for this alleged conspiracy, and it is further charged that each and all of them carried out the objects of the conspiracy, and did slander the plaintiff. There were directed verdicts for each of the defendants, jointly and severally, and plaintiff appeals.—*Reversed and remanded.*

*Mason & Dyer,* for appellant.

   *O. M. Slaymaker,* for appellees.

   SALINGER, J.—I. The petition was in three counts. We need consider the first one only, because all matter added

in the second and third count to the' allegations of the first has no support in the evidence. The first count charges that the defendants, Boyd Husted, Earl Husted, and Gale Husted, conspired together at the funeral of their father, who was the husband of the plaintiff, to publish the false accusation that plaintiff was guilty of the murder of her said husband, by poison administered.

At the close of all the testimony, all three of the defendants moved jointly and severally that verdict be directed for them, on the general ground that there was no competent evidence of conspiracy or of joint action, to support a recovery on the petition. The court finally directed verdict for all of the defendants, and appellant complains.

The record is out of the ordinary, in that most of it exhibits exclusions of testimony. Practically all received was this: Plaintiff was married to the father of the defendants on May 27, 1913; she lived with him until his death; all arrangements were made for having the funeral cortege depart, but the departure was held up for something like an hour; while in the carriage in the funeral procession, with her daughter and the daughter's husband, the defendant Earl Husted, the latter said to plaintiff she never would have come out and married his father if she hadn't wanted to get his money; she answered, "Do you think, as happy as your papa and I lived together, that I would do anything to shorten his days?" and he replied, "It looks that way;" and after the death, plaintiff and some of the sons called on the doctor who attended decedent in his last illness, bottles of medicine were brought, and the substance of the talk was a statement by Earl, in connection with the death of his father, that they suspected the poisoning of the father by plaintiff. But, on the authority of *Campbell v. Park,* 128 Iowa 181, we may consider what would be in the record, had it not

1. APPEAL AND ERROR: presumptions: exclusion of evidence: necessity to disclose purpose.

been wrongfully excluded. As was said in *Ballinger v. Con-nable*, 100 Iowa 121, at 129:

"It is well to consider what the question propounded to the appellant and the testimony which it was proposed he should give, tended to prove."

At this point, appellee urges that there should be no reversal for exclusion, unless there be a formal offer to show what answer is expected. The writer took that position in the dissent in *American Exp. Co. v. Des Moines Nat. Bank*, 177 Iowa 478, but was in the minority. Beyond debate, it is easier to infer what would have been answered in the case before us than to infer it in the *Express Company* case. And within the rule of that case, the form of questions here, in the light of the whole record, sufficiently indicates what plaintiff was attempting to prove. It may be added that proffert was frequently made and frequently rejected or excluded.

Had some of the exclusions complained of not been made, it may reasonably be said that much would have been added to the weight of the testimony for the plaintiff. We should now know why proceeding with the funeral procession was delayed. Had it not been stricken out, the record would show that the undertaker, Benson, said, in the presence of Gale Husted and of others, "Mrs. Husted, you have already got more trouble than you could bear; I have still another to add to it; your son accuses you of his father's death;" that plaintiff then inquiring what son it was, Benson replied, pointing to Gale, "that one there," and said it was Gale; that Gale remained silent, and did not deny he was making such accusation. Under the principle declared in *Foster v. Trenary*, 65 Iowa 620, at 624, this made it at least a question for the jury whether Gale was making such accusation. Had it not been stricken out, it would be in the record that, after being told of the attitude of

2. EVIDENCE: admissions: acquiescence or silence.

Gale, plaintiff went to an upstairs room, where her daughter and defendant Earl Husted were; that, in the presence of Earl, she said to her daughter, "Do you know ·why they have held the funeral?" The daughter replying, "Why?" plaintiff said, "The boys are suspicious of me being ·the cause of your father's death." The daughter exclaimed, "Oh, Earl," and fainted; and Earl seems to have remained silent, except for the statement in the carriage, made later, and already set out. Had it been received, we would have an answer from plaintiff as to whether, on the day of the funeral, there was an accusation or charge made against her, accusing her of being the cause of her husband's death, and who made it. We would have an answer from the undertaker, on whether either of the defendants asked him as to the wisdom of calling up, or told him to call up, the coroner or county attorney, and whether he did call these officers up, and at the request of the defendants, or one or more of them. The undertaker did testify he had conferences with some of the defendants in two places, but was not allowed to say whether, as a result thereof, he called up the county attorney, and inquired whether, under the circumstances, he should proceed with the funeral; whether or not, from what he heard the defendants, or some of them, say, he believed it his duty not to inter the body until after the facts had been laid before the peace authorities. The county attorney was not allowed to say whether the undertaker called him up in reference to ·this·subject, and if he did, what he said. Had his testimony been received, it is reasonable to infer he might have said Benson informed him that members of the Husted family were objecting to the interment of the body; that these members claimed the death of their father was caused by foul play; and that the undertaker wanted the advice of the county attorney on whether the body should be interred then, or further de-

3. CONSPIRACY:
   civil liability:
   evidence.

velopments be awaited. Had answers been

**4. LIBEL AND SLANDER: evidence: defamatory sense of words.** permitted, there would have been such testimony as is permitted by cases like *Arnold v. Lutz,* 141 Iowa 596, *Barton v. Holmes,* 16 Iowa 252, *Kidd v. Ward,* 91 Iowa 371, *Wimer v. Allbaugh,* 78 Iowa 79, and *Prime v. Eastwood,* 45 Iowa 640, as to the understanding of words spoken, leaving it a question for the jury whether the words were used in a defamatory sense. Had reasonable latitude in receiving testimony been indulged in, there is every reason to believe it would have become a question for the jury whether what each of the defendants said, did, or omitted to do, established that they were acting together in charging the plaintiff with having murdered her husband. It may be conceded that no one of the items excluded would make a case for a jury, or even that all the excluded matters would not make such a case, without being added to what was received. But a litigant is not bound to make his case by one answer, and it is clear there was error in excluding many proper items of proof. This is so unless a conspiracy may not be shown by circumstantial evidence and reasonable inferences and deductions therefrom—which is not the law. See *Spies v. People,* 122 Ill. 1 (12 N. E. 865).

We are of opinion that the exclusions which have been referred to were erroneous, and that the testimony received, plus what it is reasonable to believe would have been added, had there not been such exclusions, required submitting the charge of conspiracy to the jury. This, of course, is a contingent holding; and whether, on retrial, this charge shall be submitted to the jury, depends upon whether the answers erroneously rejected will be, in substance, what we have assumed they will be. This is necessarily the situation, whenever there is a reversal for exclusion. We cannot reverse without inferring that what was excluded is material. But it may always transpire that,

when answer is made, nothing material is adduced.

II. The trial court held that, though proof of conspiracy had failed, yet any individual defendant might be held liable, if there was evidence that, as an individual, he did what the petition charged; and it was

**5. PLEADING: issue, proof, and variance: conspiracy to slander: individual slander.** further of opinion there was evidence of such individual action against the defendants Earl Husted and Gale Husted. In some of the earlier cases, this court took the view that, where a joint tort is averred, a joint tort must be shown, and if that fails, no judgment of any kind should be rendered. See *Barnes v. Ennenga,* 53 Iowa 497. This holding of the *Barnes* case was, in effect, overruled in *Boswell & Tobin v. Gates,* 56 Iowa 143, at 144, in *Lull v. Anamosa Nat. Bank,* 110 Iowa 537, at 544, and in *State v. McAninch,* 172 Iowa 96, at 105. The great weight of authority in the present day is against said ruling in the *Barnes* case. Charges of joint action are now dealt with "on the simple theory that two equals two times one; that an accusation that A and B committed a murder is, in logic, equivalent to asserting that A committed murder and that B did, and that, therefore, B may not escape because A proves innocent." And see *Rush v. Commonwealth,* (Ky.) 47 S. W. 585; *State v. Wadsworth,* 30 Conn. 55, 57; *State ex rel. Griffin v. Mills,* 39 N. J. L. 587; *State v. McClintock,* 8 Iowa 203, at 206; Chitty on Criminal Law (3d Am. Ed.), 270, 271; *State v. Hunter,* 33 Iowa 361; *Commonwealth v. Brown,* 78 Mass. 135; *Boswell v. Gates,* 56 Iowa 143, 144. It is said in *Commonwealth v. Brown,* supra:

"It is a well-established principle, in all cases, civil as well as criminal, that a charge in tort against two is several, as well as joint, against all and each of them. All or part may be convicted, and all or part may be acquitted."

And in *Lull v. Anamosa Nat. Bank,* 110 Iowa 537, we say that this rule "is alike applicable to actions *ex contractu*

and *ex delicto*." In *Young v. Gormley*, 119 Iowa 546, the charge was that a mayor and two councilmen conspired and confederated together unlawfully to injure plaintiff's real estate, etc.; and we held that, to bind all, a conspiracy must be shown; but that, where a tort may have been committed by one or more, independent of any conspiracy, the allegation of conspiracy is immaterial, and recovery of damages may be had against any participating in the tort. We adhere to this rule. But though we do so, we are of opinion that, on retrial, such rule should not be applied to this case. The basis of the rule is that an act is complained of which the defendants may do jointly or severally.

Now, libel may be the joint act of several. One may furnish the material for the publication, and another publish it. After the publication is made, a third person may ratify it, or be jointly held for circulating the published libel, by selling the publication or helping sell the same, or otherwise putting the libelous article before those who, without his aid, might not see it. See *Fogg v. Boston & L. R. Co.*, 148 Mass. 513 (20 N. E. 109) ; Wharton on Criminal Law (10th Ed.) Section 211a; *State v. Armstrong*, 106 Mo. 395 (16 S. W. 604). But though this be so of libel, it is not true of slander, because there cannot be a joint slander. See *Hinkle v. Davenport*, 38 Iowa 355, 358. When several say the same slanderous words of the same person, it is, in the very nature of things, an individual offense, and never a joint act. No joint liability arises unless there is a conspiracy to slander. Hence, slander is an exception; and if there be a suit for conspiracy to slander, the case is at an end if there be no evidence of conspiracy, even though there be evidence that the defendants, as individuals, did slander.

Having held that, if the proof failed on concerted action, the plaintiff might not proceed against either defendant, it, of course, becomes unnecessary for us to pass up-

on the complaint that the trial court erred in compelling the plaintiff to elect against which one of the defendants she would proceed as an, individual.

III. Many other exclusions of testimony are claimed to have been erroneous. As to these, it suffices to say that the exclusion made was either right, or, if erroneous, was harmless; and that still others are not likely to recur on retrial. The direction of verdict in favor of the defendants was erroneous. Wherefore, the judgment below is reversed. —*Reversed and remanded.*

LADD, WEAVER, GAYNOR, and STEVENS, JJ., concur.

EVANS, J. (dissenting). I. I cannot concur in the reversing opinion. A careful consideration of the record satisfies me that the judgment of dismissal should be affirmed. The petition was in three counts. The first count charged a conspiracy to slander. The second count charged that the defendants slandered plaintiff, in that they accused her of the crime of bigamy. The third count charged that the defendants slandered her in that they accused her of being an adventuress. The opinion sustains the action of the trial court in dismissing the second and third counts of the petition for want of evidence to support the same. I concur in this view, and therefore have no need to consider those branches of the case. The allegations of Count 1 are as follows:

"That she is now, and has been for nearly three years last past, a resident of Clarke County, Iowa, having lived from April 8, 1913, until December 7, 1914, upon the farm of one T. W. Husted, now deceased, whose said farm was near Lacelle, Clarke County, Iowa. That, during the major portion of the time herein described, she was acting as housekeeper, and performed the duties of housekeeper and housewife for the said T. W. Husted upon his farm, and that, up to December 6, 1914, she enjoyed the respect, con-

fidence, and esteem of the people of that community and the communities where she had hitherto dwelt, during her life of forty years. That upon said date, viz., December 6, 1914, and at the funeral of the said T. W. Husted, the defendants herein named confederated and conspired together to publish and did publish, in the presence' and hearing of one W. H. Benson and others there assembled to attend the funeral services of said T. W. Husted, as nearly as plaintiff can recall, the following words and matter, to wit: That the plaintiff was guilty of murder of the said T. W. Husted, by means of having administered to him poison, whereof he died; that she was guilty of bigamy committed with the said T. W. Husted; that she was an adventuress, and came to the Husted farm for the purpose of procuring an interest in his estate, or getting money from him. That they desired to stop the funeral, and demanded a post-mortem examination by the coroner of Clarke County. That each and all of these said statements so made were maliciously made by one or the other of these defendants, in the presence of a large concourse there attending the funeral, and that similar statements were maliciously made at the church, after the funeral cortege had left the house. That each and all of these said statements, made in manner and substance as indicated herein, were malicious, false, and untrue, and by the defendants known to be false and untrue, and were made by them for the express purpose of depriving plaintiff of the benefits of public confidence and esteem and regard of her neighbors and friends of the said T. W. Husted, and for the purpose of putting plaintiff in fear and consternation, and to prevent her from claiming any share of the estate of the said T. W. Husted, or presenting any claim for services which she had rendered the said T. W. Husted during his lifetime, and for the purpose of compelling plaintiff to leave the state of Iowa."

The majority opinion treats the foregoing as a charge

of conspiracy to slander. In the construction thus put upon the petition, I concur. The majority opinion holds that the evidence, including that offered and rejected, was sufficient to go to the jury on the question of conspiracy. I am not able to concur in this view. The opinion further holds that material and proper evidence was erroneously rejected. I am not able to concur in this view. I shall presently set forth all the evidence introduced which has any tendency to prove a conspiracy. I shall also set forth specifically the questions appearing in the record which were held objectionable by the trial court which relate to the rejections indicated in the majority opinion as erroneous exclusions.

It will be noted that the petition charged a completed conspiracy to slander the plaintiff, at the time of the funeral, and in the presence of the persons there attending. It is charged also that, in pursuance of such conspiracy, they did so slander her at such time and place. While the majority opinion states that the plaintiff was the wife of the deceased at the time of his death, neither the plaintiff nor her counsel have been willing to commit themselves to that statement. Her petition alleged that she was "his housekeeper and housewife." The plaintiff testified, also, that a marriage ceremony had been performed. Her counsel, in his brief, refers to her as the "putative wife." She does not appear ever to have borne the name of the deceased. The implications of the record, as a whole, are that the plaintiff rested at all times under the obligations of a prior marriage to another husband, whose name she still bore. See, also, *Yocum v. Taylor*, 179 Iowa 695. The defendant Boyd Husted was the brother of the deceased. The other two defendants were the sons of the deceased. It may fairly be inferred from the evidence that these sons did not look with favor upon the relation of the plaintiff and their deceased father, and that they were dissatisfied with the circumstances attending the death, and that they were in

doubt as to their duty in the premises. I set forth herein all the evidence introduced which tends in any degree to prove the alleged conspiracy or slander, as charged in the petition. I set the same forth by question and answer, omitting all objections and rulings. The plaintiff herself testified as follows:

"Q. What did Mr. Benson say, in the presence of Gale Husted and in the presence of those parties here named,— confining your answer to what was said in response or in respect to Mr. Husted's death and its cause? A. He says: 'Mrs. Husted, you have already got more trouble than you could bear. I have still another to add to it,' he says, 'your son, he accuses you of his father's death.' Q. And what did you say? A. I said, 'What son?' and he said, 'That one there;' and that was Gale. (The defendants now move the court to strike from the record and to withdraw from the consideration of the jury the answer of the witness, for the same reason as stated in the objections.) Q. Mr. Benson pointed to someone? A. Yes, sir. He said that son. He said that was Gale. Q. What did you do, right in this very connection? A. I went upstairs to a room where my daughter was, and broke down. Q. Who was present when you went to the room of your daughter? A. Earl Husted, the husband of my daughter. Q. What was said by you in their presence—confining your answer to what was said in connection with the death of T. W. Husted and who caused it? A. I says to my daughter: 'Do you know why they have held the funeral?' and she says, 'Why?' and I says: 'The boys are suspicious of me being the cause of your father's death.' Q. What did your daughter say— confining her remarks to what was said in the presence of Earl Husted? A. 'Oh, Earl!' and fainted. * * * A. I think it was about an hour that the funeral was held up. We went from the house to the church. Q. Who occupied the same carriage with you? A. Myself, my daughter, her

husband, and I think Mr. Husted's son Guy. Q. Was there anything said, going from the house to the church or from the church to the cemetery, in respect to what caused Mr. Husted's death, by Earl Husted? You can answer that. yes or no. A. Yes, sir. Q. I will ask you to state the conversation in respect thereto. A. I said: 'Earl, do you think, as happy as your papa and I lived together, that I would do anything to shorten his days?' and he says, 'It looks that way.' "

W. H. Benson, the officiating undertaker at the funeral, testified in her behalf as follows:

"Q. Now, when you got there, were there any objections being made as to the funeral going on, by any of these defendants? A. Not when I first got there. That is, not right on the first start. Q. Who was it said anything to you about the funeral not going on at once? A. Well, as you have stated the question, there was nothing said about holding the funeral. May I state what was said? Mr. Dyer: Yes, sir. * * * Q. Do you see any of these defendants?. A. Well, Boyd, I know very well, but the other boys I don't know, one from the other. We were quite a ways apart when the boys grew up. I know they are Husteds. I do not know which is Earl and which is Gale. I had a conversation that day with Boyd and the two boys. I am not quite certain where it took place—whether at the door yard near the door or out at the barn. I had more than one conversation with these three, and they were all in respect to the one subject, in connection with this funeral. Q. What did either of these defendants say to you in respect to the cause of T. W. Husted's death? A. There was nothing said to me about the cause of his death, at any time. Q. And that, as a result of these conferences, if you had more than one,—did you have more than one with these parties, or some of them? A. One in one place, then we moved on a little, and had another one there. Q. Now, Mr. Benson, you remember of go-

ing to see the plaintiff in this case and having some talk with her in reference to Mr. Husted's death, did you not? Answer that, yes or no. A. Not in reference to his death. Q. In reference to what? What was it in reference to? Well, let me inquire. I will withdraw that. You recollect of seeing her when Gale Husted was present, and perhaps Mrs. Siefkas and Mrs. Switzer? Do you remember of talking to Mrs. Yocum in the presence of these people? A. Yes, sir. Q. At that time, you stated to Mrs. Husted, or Mrs. Yocum, that the boys, meaning the Husted boys, were suspicious of Mr. Husted's death. Do you remember of such a conversation? A. There was nothing of the kind said. Cross-examination: Neither of these defendants did say that this woman had anything to do with the death of T. W. Husted."

R. W. Meeker, the officiating minister, testified in her behalf as follows:

"I know the defendants Boyd and Gale Husted, and saw them that day at the funeral. Q. Where did you see them first? A. I think perhaps they were in the living room of the house. I first met them on that day. Q. Did you see them when they were alone together? A. Two of them. I had a conversation with them at the barn. I am not certain whether all three of the defendants or but two of them were present. If only two, it was Boyd Husted and Earl Husted. I did not meet and talk with the three defendants alone at any other place. It was between half past nine and ten o'clock. * * * Q. What was said in this connection, Mr. Meeker? A. The statement was made that they were undecided as to whether to proceed with the funeral, on account of being dissatisfied. Q. Was there any discussion at that time as to whether there should be a post mortem held? A. There was not. Q. How long was the cortege held up there at the house? A. I think about an hour. That is, we were about an hour late, leaving the house. Q. Did you hear any of these defendants make a

statement in respect to the manner of T. W. Husted's death, and whom they thought was responsible therefor? A. No, sir. * * .* I had another conversation with some of these defendants. It was near what I would term a woodhouse, in the same yard with the dwelling house. There was present at the conversation the three Mr. Husteds and Mr. Benson. Q. Was there anything said at that time in respect to the manner of his death, by any of these parties? A. No, sir. Q. At this meeting at the woodhouse, as you called it, were you invited to attend it, by some of the defendants? A. No, sir, I was not invited at all. Q. Do you know, as a matter of fact, that these defendants, or some of them, were making a charge on that day and a claim on that day that the plaintiff in this case was responsible for T. W. Husted's death in some way? A. I don't know."

The foregoing is all the evidence of what occurred on the day of the funeral which tended to show either conspiracy or slander at that time.

To the foregoing it should be added that, two weeks later, the plaintiff and the two sons of the deceased brought the remnant of medicines to the office of Dr. Douthett for examination. On that day, Dr. Douthett had a conversation with the sons, concerning which he testified as follows:

"Well, they came into my office. There were some patients waiting there, and they said they wanted to speak to me privately, and I took them into the private office, and they said they had suspected their father had been foully dealt with. That they suspected, they said, that their father had been foully dealt with,—I don't know the exact language. That was it in substance. I asked them what the trouble was, and they said—it kind of surprised me, and I asked them what the trouble was—and they said that they suspected that he had been poisoned, and I said, 'By whom?' and they said,—I don't know the exact language,—

'By that woman down there.' I think that is what they said—that is my recollection. Q. Whom did you understand they meant by 'that woman?' A. This lady sitting here,—Mrs. Husted, or Mrs. Yocum."

The petition predicated nothing upon what was said and done on that day. We may assume, therefore, that this evidence was offered in aggravation of damages, for which purpose it was admissible. I do not think that it could be regarded as in the nature of an admission by the defendants of the existence of a past conspiracy on the day of the funeral. Nor has such contention been made for it by appellant's counsel.

I do not understand the majority opinion to hold that the evidence actually introduced was sufficient proof of the alleged conspiracy. I need not, therefore, dwell upon that proposition. The emphasis of the opinion appears to be laid upon the erroneous exclusion of appropriate testimony, which, if admitted, might have been sufficient to sustain the allegations of the petition. I have set forth the foregoing evidence which was actually introduced, partly because of its important bearing on the question of exclusion. To this question I now turn.

II. In the examination of the plaintiff herself as a witness, the following questions, put to her by her counsel, were held to be objectionable:

"(1) I inquire of you whether, upon the Sunday morning, the day of the funeral, there was an accusation or charge made against you in respect to accusing you of being the cause of T. W. Husted's death.

"(2) I am inquiring whether Mr. Husted, in the carriage going from the house to the church or from the church to the cemetery, stated to you that you would never have come out there and married his father, if it hadn't been that you wanted to get his money.

"(3) And in connection with that visit, did you bring

to Dr. Douthett all the vials of medicine and everything of the kind, and in Dr. Douthett's office, and in the presence of Earl Husted, say: 'Here are all the medicines and everything that was given him. I wish you would examine them, and see if there is anything wrong with the medicines,' —in the presence of Earl Husted?"

In the examination of the witness Meeker, on behalf of plaintiff, the following questions put by her counsel were held to be objectionable:

"(4) I will ask you to answer the question propounded to you. What was said in respect to the funeral going forward or its not going forward?

"(5) I inquire whether one or the other of these three defendants stated, in your presence and hearing, that they were not satisfied with the manner of Mr. Husted's death.

"(6) I inquire of you whether these defendants there present asked you whether or not they ought to hold the body until there was a post-mortem examination held.

"(7) Was there anything said there by these defendants—I am talking now of the barn episode—that conveyed to your mind the thought and idea that they believed that this man had met death in a foul way? (The Court: You may show the words stated, and then show how the words were understood by the person to whom the words were addressed. Plaintiff excepts.)

"(8) Was the question there discussed as to whether or not the authorities should be advised, or the county attorney, or the coroner?

"(9) Do you know, as a matter of fact, that these defendants or some of them were making a charge on that day and a claim upon that day that the plaintiff in this case was responsible for T. W. Husted's death in some way? (The Court: The question is too general. It does not ask specifically. However, the witness may answer, if he

knows.)    A. 1 don't know.    Q. I inquire of you whether, since the funeral, you have heard such charges."

In the examination of the witness Benson, in plaintiff's behalf, the following questions put by her counsel were held to be objectionable:

"(10) Did either of these defendants say to you that you should call up, or it would be wise to call up, the coroner or the county attorney? Was that discussed in your presence or in the presence of Boyd or Gale Husted or any of them?

"(11) I inquire of you—you called up the county coroner or the county attorney, did you not?

"(12) And they were called up at the request of these defendants, or one or more of them?

"(13) From what you learned that day, and what you learned and heard from these defendants, or some of them, you believed that it was your duty not to inter this body until the facts had been laid before the peace authorities of Clarke County?

"(14) What you learned from the conferences had with these defendants, or one or more of them, you are led to believe and did believe that they were suspicious, to say the least, or led you to believe that they suspected that this man, T. W. Husted, had been poisoned, and therefore it was your duty, under your situation, to inquire of the peace authorities of Clarke County before interment.

"(15) I want to inquire if the lateness of this funeral was not due and occasioned by statements and innuendoes made by these defendants, or some of them, in respect to the manner of T. W. Husted's death.

"(16) That the occasion of the delay of this funeral,— that the statements made by these defendants, or some of them, were of such a nature and character that would lead you to suspect, or would lead anyone to suspect, possibly—

I will withdraw that latter clause—that T. W. Husted met his death in a foul way?

"(17) I will ask you if these defendants, or some of them, did not say to you that they were not satisfied with the manner of T. W. Husted's death.

"(18) And in that connection, the same defendants indicated that the plaintiff in this action was in some way responsible for that death?"

In the examination of Henry Stivers, county attorney, on behalf of plaintiff, the following questions pertaining to a telephone conversation between the witness and Benson were held objectionable.

"(19) Did he state to you that members of the Husted family were objecting to the interment of the body, or in substance that?

"(20) Did he state to you that members of the Husted family had claimed that the death of Husted was caused by foul play, and he wanted your advice in the premises whether he should inter the body then or await further developments?"

While the record contains much colloquy and repetition, the foregoing questions which I have set forth comprise, without repetition, all the questions put by plaintiff's counsel to her witnesses which were held objectionable. The majority opinion does not indicate any specific question as having been erroneously rejected, and yet the trial court, upon a retrial, must be confronted with that very question. If there was an erroneous exclusion of evidence, the error must be found in the rejection of some or all of the questions which I have herein set forth. It will be noted at a glance that many of them are leading and suggestive. Many others call for conclusions and impressions of the witness, and for hearsay. The trial court repeatedly advised counsel of the grounds of rejecting the questions propounded along these lines. It will be noted, also, that the matters

sought to be elicited by some of these questions were later testified to by the same witnesses, as will appear from the testimony actually received, which I have set forth above. I have numbered the rejected questions, as above set forth, for convenience of reference.

No. 1 was clearly objectionable. No. 2 was later answered by the witness, in that the conversation was fully stated by her. No. 3 was clearly immaterial. Furthermore, the circumstance was fully testified to by Dr. Douthett. Matters inquired about in Nos. 4, 5, and 6 were testified to by the witness Meeker, and are above set forth. No. 7 was modified, upon the suggestion of the court and answered, and is included in the testimony introduced, which I have above set forth. No. 8 was of doubtful materiality, and had been negatived by the witness. If it had been answered in the affirmative, it could not change the result in this case. No. 9 was a double question, the first part of which was answered. The unanswered part called for hearsay, purely. Nos. 10 to 18 were questions put to Benson. The first four pertain to consultation between the witness and the county attorney. If each question had been answered in the affirmative, it could not have affected the result. Each of the questions was clearly objectionable in form. The other rejected questions put to this witness called for the merest conclusions, and were objectionable for that reason. Nos. 19 and 20 were questions put to the county attorney, and called for the merest hearsay.

Turning now to that part of the majority opinion which deals with the excluded evidence, much of the evidence recited therein which is deemed to have been erroneously objected to was, in fact, received, as will be seen from what I have set forth herein.

Though the majority opinion does not specify (as I think it ought to do) the particular rejected questions which ought to have been permitted, the necessary effect of the

holding is to say that the rejected questions Nos. 19 and 20 were proper, and should have been permitted; likewise, that rejected questions 13 and 14 were proper, and should have been permitted. I cannot think so. The question of difference between us at this point is so elementary that I will not discuss it. The opinion treats the rulings of the trial court as having excluded evidence which might have been material, and quite ignores consideration of whether the questions propounded were proper questions. In order to maintain her case, the plaintiff was required, not only to adduce material evidence, but she was required to adduce it by appropriate interrogation. It was not permissible to her to adduce even material evidence by improper questions. Even improper questions might adduce proper evidence. It was the duty of the trial court, nevertheless, to hold counsel to proper interrogation. This is what was done in this case. Having gone through this record with much care, I am unable to find any ruling of the court in the rejection of evidence which can fairly be said to be erroneous. I think, therefore, that the case ought to be disposed of here upon the evidence appearing in the record. It will hardly be contended, I take it, that this is sufficient to justify a reversal. Indeed, the emphasis of appellant's argument here is laid upon the claim of alleged slander perpetrated, and not upon the conspiracy, as is indicated by the following quotation from her brief:

"The trial court seem to think that conspiracy was the gravamen of the charge. It was merely an incident of the charge. The real charge was slander."

The opinion holds that conspiracy is the gravamen of the charge, and not slander. With this view I agree. I think, therefore, that the record does not justify a reversal as to any defendant.

I am constrained to direct specific attention to the state of the record as pertaining to the defendant Boyd Husted.

There is not a word in the evidence, either that rejected or that introduced, which connects him in any way with either the alleged conspiracy or the alleged slander. His name is barely mentioned in any of the evidence received or in any of the rejected questions. All that appears is that he was a brother of the deceased's, and was at the funeral, and may have been present at the conversation with the officiating minister, Meeker. This conversation was testified to by Meeker, and of a certainty disclosed nothing upon which a verdict against this defendant could rest. I would affirm.

PRESTON, C. J., concurs in this dissent.