ANNA J. JENKINS, Appellant, v. CHARLES T. ROBISON et al.,
Appellees.

**WILLS:** Testamentary Capacity—Jury Question. Evidence relative to
1  the mental competency of an aged testatrix to execute a will re-
viewed, and—while concededly a close question—held to sustain a
verdict of incompetency.

**APPEAL AND ERROR:** Harmless Error—Poor Reason for Correct
2  Ruling. The exclusion of testimony on an inapplicable objection is
harmless when an applicable objection existed.

*Appeal from Poweshiek District Court.*—D. W. HAMILTON,
Judge.

JUNE 23, 1922.

REHEARING DENIED DECEMBER 15, 1922.

WILL contest. Jury trial, and verdict for contestants. Pro-
ponent appeals.—*Affirmed.*

*W. C. Rayburn* and *Lewis & Dickson,* for appellant.

*T. J. Bray,* for appellees.

PRESTON, J.—1. Proponent is one of the daughters of de-
ceased, Elizabeth B. Robison, and the three contestants are the
other children of deceased. The trial court withdrew from the
consideration of the jury contestants' objections
that the will was procured through fraud and
undue influence, and submitted only the ques-
tion as to whether, on the day the will was executed, deceased
possessed sufficient mental capacity to execute a valid will. The
instructions are not complained of. There are a few exceptions
to the rulings of the court on objections to evidence, but appel-
lant's main reliance for a reversal is based upon the alleged in-
sufficiency of the evidence to take the case to the jury and to
sustain the finding. More than 60 witnesses were examined.

1. WILLS: tes-
tamentary
capacity: jury
question.

It is a border-line case on the facts, and close to the border;
but, under the whole record, the case was properly submitted to
the jury. It is often difficult, in close cases, to determine. The
law has provided a method for determining disputed questions
of fact, by a submission of the same to a jury. The twelve
jurors have passed judgment. The trial judge, having, as well
as the jurors, seen and heard the witnesses, in overruling the two
motions to direct a verdict for proponent and in overruling the
motion for new trial, one ground of which was that the evidence
was insufficient, has passed his judgment. This is not, of course,
always conclusive; but, as said, under the entire record, we all
agree that there was a jury case. We have observed that it fre-
quently happens in contests of this character that the evidence
of the different witnesses is exaggerated or shaded, both by
those testifying to mental capacity and by those testifying
against. Those for, consider an elderly testator to be singularly
active, bright, and of strong mentality for one of his or her
age. On the other hand, witnesses testifying to mental un-
soundness attempt to give conversations occurring years before,
and often exaggerate and color acts which, if deceased were here
to explain, might be of little or no significance. There may be,
perhaps, one or two transactions a year, extending over a period
of years, which, when gathered together in a hypothetical ques-
tion, on the face of it look formidable. Often, the hypothetical
question is so framed as to shade or exaggerate the circumstances
which the witnesses have already colored. But there are cases
where, because of age, disease, and other causes, a person is not
mentally competent to make a valid will. It is equally true that
there are cases where mental incapacity is claimed when it does
not exist. Under the circumstances, the best that can be done
is to bare the life history, acts, conduct, etc., in court, even
though this may not always be done in a perfect and exact
manner; and ordinarily, it is for the jury to say, from all the
circumstances, whether or not a person is mentally competent,
within the meaning of the law, to make a will. The courts are
more free to interfere in such cases than in some others. *Evers
v. Webb,* 186 Iowa 1172, 1178. That there is mental unsound-
ness in some degree does not make one incompetent. Though
one may be old, and feeble in body or even in mind, he or she

has the right to manage and dispose of his property as he wills, until a time arises when he is so completely deprived of reason and judgment that he is incompetent, within the meaning of the law, to do so. *Evers v. Webb,* supra, at 1184. Since we agree, in the instant case, that the fact question presented herein was for the jury, no useful purpose would be served by a recital or discussion of the details of the mass of evidence. A general outline will be sufficient for the purposes of the opinion. Appellant cites cases wherein we have held, notwithstanding the verdict of the jury, that the evidence was insufficient; but we have said many times that each tub must stand upon its own chimb, or words to that effect.

The estate amounts to about $150,000, largely in land. The proposed will provides that, after payment of debts, the contestants shall each be paid the sum of $10, and that the remainder shall be paid to proponent, who is named as executrix. The will was executed November 3, 1919. Mrs. Robison died some two months thereafter, aged 79 years. Some of the circumstances which contestants claim are shown by the evidence are that, while deceased was a young woman, with four small children, she separated from her husband, and brought her family from Wisconsin to Poweshiek County, Iowa, where three of her brothers were residing. She never remarried. She kept house for a bachelor brother, Henry Booknau, on a farm, from 1881 until June, 1917, when he died. During these years, she kept house and worked in the fields. A large amount of property was accumulated by this brother, and through him she came into possession of the property of which she died seized. In early life, she was a robust woman, careful about her personal appearance, neat and tidy in her housework and cooking. She possessed a good memory, and talked intelligently. Some years before her death, she began to break down physically. She became flighty and erratic. Her talk was rambling and incoherent, and her memory impaired. She became careless about her dress and personal appearance and about her housework. Her house became filthy and dirty. She went out of doors in the presence of men who were strangers to her, improperly clothed; used nails to hold her hair in place; stored eggs in the reception room of the home, and permitted them

to remain until they became rotten and burst; carried apples into the living room, and permitted them to remain until rotten; carried brush into the house, and laid it on the carpets; cooked and served meat that had been spoiled. When out of the house, she would peak around the house and trees and bushes. She lost her watch and the deed to 480 acres of land. Some of the lost articles were found tied up in old clothes under the commode in the bedroom. Her eyes had a vacant, glassy stare, and her lower jaw dropped. She failed to recognize her grandchildren, with whom she was well acquainted; would get out of bed at night and talk to the stars; kept wood in the barn loft, instead of the woodshed; mumbled to herself; kept hayforks in her bedroom; lost a roll of paper money, which was discovered by another in the ash pan of the heating stove. In 1917, she moved from the farm to Grinnell. Prior to the death of her brother, she had no property. Up to this time, she had been on good terms with all her children. After she came into this property, proponent, who was worth $40,000 in her own right, wrote her brother Charles, in Milwaukee, that a guardian should be appointed for deceased, and proposed to join with the three contestants in an application for guardian; but when Charles was appointed temporary guardian, proponent refused to go on, and opposed the guardianship; and the action was dismissed. From that time on, there was enmity between proponent and contestants, and it is claimed that she prevented her mother from having anything to do with contestants. Contestants had very little means, and their financial condition was known to deceased. After deceased moved to Grinnell, other circumstances similar to those before stated continued, and the evidence thereof is given in considerable detail. Among such circumstances, deceased refused to contribute to the Red Cross, giving as a reason that she could hardly get enough to eat. On one occasion, she started to walk to her farm, and got lost. She stated to different people that contestants were trying to put her in an insane asylum; sometimes stated that she was going to divide her property among her children, and at other times stated that if she did, they would squander it. She complained of severe pains in her head. She was afflicted with arteriosclerosis for some time before her death, in an advanced stage.

A medical witness testifies that she was afflicted with senile dementia. A large number of witnesses expressed the opinion that she had been of unsound mind for some years before the instrument in question was executed. It is further contended by contestants that the will is unreasonable and unnatural in its provisions. It is further claimed that proponent, prior to the execution of the will, had stated that her mother was having mental trouble; that she made arrangements for the preparation of the instrument, taking her mother to the office of the lawyer who drafted the will. Proponent did not testify as a witness. There are other circumstances, some of which, and those recited, are qualified and explained to some extent.

On the other hand, in a general way, appellant's claim for the evidence is that deceased was a good mother to all her children. She and the children went to her brother Henry's farm, where they all labored and saved and struggled, practically as partners, under Henry's name, for many years, and until his death; and they had accumulated as one witness puts it, about 1,000 acres of land, worth a quarter of a million dollars. Her evidence is that this achievement is due largely to the persistency, industry, energy, and good judgment of deceased, in connection with her brother, and that the property was acquired by the joint enterprise of both. The death of her brother was a great grief to deceased, and she mourned it wildly, calling him to come back, and for a time gave way to paroxysms of grief. A few days after the execution of the will in controversy, a stipulation in settlement of the claims of deceased against the college was signed by her and by the college officers and by the administrator of her brother's estate, which resulted in giving her the leases and rent notes on some of the land, which, with money in the bank, gave her something over $7,000 in money. It appears that the college was making a claim to the property, as residuary legatee under the brother's will. The settlement and stipulation provides that deceased was the full owner of the two farms, and that the college, or Henry's administrator, was to pay her $5,000 in cash. The court approved this stipulation. It is claimed that no one connected with these transactions ever suggested that deceased was not in full possession of all her mental faculties and fully competent to transact such

important business. It is claimed that the evidence shows that the purpose of contestants in the guardianship matter was to prevent deceased from making a will. It is contended by appellant that, by the testimony of the contestants, by the testimony of bankers, lawyers, and neighbors, and by the trust her brother gave her up to his last sickness, for many years, up to the time she was incapacitated by her last sickness, deceased was always a sane, capable business woman, and that any construction of the evidence which tends to support contestants' claim is a forced and unnatural construction. In 1916, her brother arranged with the bank, and gave her general authority to check on his account. She was authorized to loan contestant Charles $500. She carried an account in the bank from the time of her brother's death until her own death. There is one check in 1917 signed by her, twenty-nine checks in 1919, one on the day the will was executed, one on November 12th thereafter, and another on November 21st. Appellant contends that she was, up to this time, doing her own business. In 1918, she gave one bank four notes for borrowed money, totaling nearly $5,000, all of which were paid either that year or the next. About September, 1919, deceased renewed a loan of $6,000 on one of the farms. Mr. Hamlin, the president of the bank, testifies in regard to this transaction, and says he thinks she was alone at the time he talked with deceased about the renewal; that he saw her very seldom during the years prior to her brother's death,—once or twice a year; that he remembers only three times he saw her after Henry's death; that, at the time the loan was renewed, she spoke to him about the other farm; that, from his conversation with her and his observation and knowledge of her, the times he saw her, in his judgment she was of sound mind; that he never paid very much attention to her; that he would have noticed anything peculiar about her; that she needed someone to guide her. Mr. Pooley, president of another bank, testifies to transactions with her,—cashing checks, payment of notes, and so on,—and says he always considered her of sound mind. In 1918, deceased purchased a home in Grinnell, subject to a mortgage to the loan association, upon which she made payments to a time two or three months before the execution of the will, when she paid the balance due. The secretary to whom the

payments were made testifies that, in his opinion, she was of sound mind. She visited and managed, to some extent, one of the farms. The tenant testifies that she directed him what changes she wanted, and how; that, in August, 1919, the tenant's wife was sick, and Mrs. Robison got the dinner for a dozen corn shellers. Evidence for proponent tends to show that the boughs and brush were placed on the floor to keep moths away.

There are other circumstances tending to show competency, and, as said of contestants' evidence, some of the circumstances are modified and qualified somewhat upon cross-examination, by her method of doing business, being assisted and advised by others, and so on. It is unnecessary to discuss the evidence further, or to go any more into detail.

2. A few of the rulings on objections to evidence are complained of,—not more than five or six, which is indeed a very small number, considering that the trial of the case consumed seven or eight days. The first objection came on the recross-examination of one of the contestants, Mrs. Plum. It came almost at the close of her long examination. After she had said that, when her brother Henry Booknau died, he had about 1,000 acres of land, some of it worth $250 an acre, counsel for proponent asked this question:

2. APPEAL AND
ERROR: harm-
less error:
poor reason for
correct ruling.

"Q. And yet you want to leave the impression on the jury that they didn't have any business, and were unwise in their business methods?"

The objection was sustained, to which proponents excepted. The objection by contestants was that it was not cross-examination. We think that an objection that it was argumentative would have been better, for it is more in the nature of an argument,—though not of great importance either way. Had the objection been overruled, doubtless the objection that it was not cross-examination would not have been sufficiently specific to cover the objection that it was argumentative. The rule is different where the objection is sustained. In that case, if the question is objectionable for any reason, there is no error in sustaining the objection. *Christenson v. Peterson,* 163 Iowa 708, 711; *Baker v. Mathew,* 137 Iowa 410.

The next matter pointed out in the assignment of errors is on redirect examination of the same witness. The abstract does not show any objection or ruling.. The next objection is to the testimony of John Plum, near the close of his evidence, and on cross-examination. What we have said in regard to the first question above set out applies to this. The next. ruling assigned as error is in the cross-examination of Dr. Wiley. The ruling on an objection to a question as not cross-examination was well taken. It was not cross-examination.

These are illustrative rulings. Some of the others are not argued. They are all unimportant.

At the close of contestants' evidence, proponent moved to strike out certain evidence. Such evidence went in during the trial without objection. Furthermore, it is doubtful whether the motion is sufficiently specific. It does not point out the witnesses whose evidence is sought to be excluded. *State v. Hasty,* 121 Iowa 507. As we understand it, it relates, in part at least, to statements made by deceased to proponent, and claims that such statements are not competent substantive evidence to prove such statements, and that, therefore, such evidence as to declarations or statements of deceased is hearsay, and incompetent for any purpose. Conceding, for the purpose of the argument, that statements and declarations made by deceased would not be competent to prove the truth of such statements, still whatever she said and did would be competent, as bearing on her mental capacity.

We have examined the record with care, and conclude that no prejudicial error appears, and that we should not interfere with the finding of the jury and the' judgment of the court.— *Affirmed.*

STEVENS, C. J., WEAVER and DE GRAFF, JJ., concur.