IN RE GUARDIANSHIP OF SOPHRONIA MUNSELL.

JOSEPH SADOWSKY, Guardian, Appellant, v. MABEL MUNSELL, former guardian, et al., Appellees and Cross-Appellants.

No. 47165.

(Reported in 31 N. W. 2d 360)

MARCH 9, 1948.

Donnelly, Lynch, Lynch & Dallas, of Cedar Rapids, and Philip Scherer, of Winthrop, Minnesota, for ·appellant.

Geo. C. Claassen, of Cedar Rapids, John Tobin, of Vinton, and Lehmann, Hurlburt, Hossfeld, Blanchard & Cless, of Des Moines, for Mabel Munsell, former guardian, appellee.

Geo. C. Claassen, of Cedar Rapids, and Lehmann, Hurlburt, Hossfeld, Blanchard & Cless, of Des Moines, for Mutual Surety Company of Iowa, appellee.

OLIVER, J.—Sophronia Munsell had lived alone in a cottage in Cedar Rapids in which she had a life estate. Title to the remainder was in her two sons, Marvin of Cedar Rapids and

Victor, of Winthrop, Minnesota. Mabel Munsell is the wife of Marvin.

July 9, 1945, Sophronia's money, $10,900, was placed in a joint bank account in the name of Sophronia or Mabel. The printed part of the signature card furnished by the bank recites the account is their joint property and directs the bank to pay to either during their natural lives and to the survivor after the death of either.

Sophronia was in a hospital from October 22 to November 6, 1945. November 7th, Mabel placed her in a nursing home. January 11, 1946, upon application of Mabel, Sophronia was adjudicated insane and ordered confined in the Linn County Home. The report of Dr. Keech shows in part: age eighty-three—advanced arteriosclerosis—senile mental changes—slowly progressive—rational intervals. January 18, 1946, Mabel brought action for her own appointment as guardian of Sophronia's property, alleging her application was made at the request of Victor and Marvin. February 13, 1946, Mabel was appointed guardian and filed her oath and a $2,000 bond with Mutual Surety Company of Iowa as surety.

Apparently, Victor and his wife first learned of Mabel's activities through a letter from Sophronia at the County Home. They wrote Mabel: "Is her mind not clear or what is this county home?" "Do write and tell us all about mother Munsell and just where she is." Mabel replied: "I had mother in a lovely nursing home", but she made so much trouble "they called me and said I would have to take her out." She "even struck at them, they were very good to her." Mabel was advised they would take her in the County Home but "if she gets unruly she would be transferred" to Independence.

A later letter to Mabel indicates Victor's growing concern over his mother's condition and that he did not understand the situation. March 15th, Mabel wrote, "we can't put her in a nursing home as she has spells that she hits or throws things. She got into a real fight at the nursing home."

Victor then went to Cedar Rapids and investigated. March 21, 1946, upon his application, the court cited Mabel to appear for examination, touching the affairs of the guardianship. Mabel promptly executed her resignation. Then she attempted to

withdraw the balance in the joint bank account but found payment had been stopped. Mabel's final report was filed April 2d.

Objections filed by the successor guardian alleged Mabel had concealed assets of her ward; that while acting in a confidential and fiduciary relationship toward her ward and when the ward was incompetent Mabel had procured said ward to make the bank deposit in the name of the ward and herself; that Mabel should account for $3,500 withdrawn and appropriated by her prior and subsequent to her appointment and the bank account should be adjudicated the property of Sophronia.

Mabel's reply pleaded an agreement between the bank, Sophronia and Mabel which gave Mabel equal rights with Sophronia to make withdrawals; that Sophronia and Mabel had orally agreed that upon Sophronia's death or if she became disabled from managing or using the account Mabel was to take it, and that upon the appointment of a guardian Sophronia did become unable further to manage or use the account. She pleaded these transactions constituted a gift of the account to her from Sophronia. She pleaded also that during her tenure as guardian she had no assets out of which the prior indebtedness, if any, owed by her to her ward could have been collected. During the trial, by amendment, Mabel alleged her right to the bank account was based upon the printed statement on the signature card and that Mabel was entitled to the $7,500.10 balance because she "made the first demands on said bank for said funds."

The trial court found the evidence failed to show Sophronia was incompetent July 9, 1945, or that a confidential relationship existed between Mabel and Sophronia, but that the actual intention of the parties was that the ownership of the deposit and the sole right to withdraw therefrom should remain in Sophronia during her lifetime, and at her death any remainder should vest in Mabel, if living; Mabel should account for a $500 withdrawal made after her appointment and also for $800 withdrawn February 13, 1946, for the purchase of an automobile to which title was taken in her name. Accordingly it was adjudged Mabel had no interest in the balance of the deposit during Sophronia's lifetime, and judgment was rendered against Mabel and the surety on her bond for $1,219.75.

The court found the record showed Mabel's lack of good faith and apparent disregard of her trust, and that she, as a witness, had been rather thoroughly discredited. The record amply supports this finding. Mabel's testimony contains many obvious untruths. In one instance she admitted it was false. It is entitled to little weight.

As early as 1943 Sophronia's rambling speech and lessened care of her person were noticeable. July 9, 1945, she was aged eighty-two years, ten months, was five feet, three inches in height and weighed about eighty-five pounds. She was subject to frequent falls, and walked with difficulty. After April she left her home alone only a few times. Her house fell into a ruinous condition. A neighbor testified that in 1945 she was unable to carry on a connected conversation.

Dr. Hersh testified he treated Sophronia for a hip injury at Mercy Hospital from April 4 to May 24, 1945; advanced arteriosclerosis had interfered with the nourishment of her brain; this was the cause of her frequent falls; she was unable to carry on a conversation on one subject very long; she talked like a child; he considered her then of unsound mind, unable to handle her own affairs and look after her property; she might be able to go to banks, provide some of her own meals, purchase groceries, etc.; her mental condition was variable, sometimes she was able to grasp instructions and sometimes not; her condition was progressive and would gradually become worse. This appraisal of Sophronia's condition in May 1945 differed little from that reported to the Insanity Commission by Dr. Keech in January 1946.

When interrogated concerning the care given Sophronia, Mabel testified:

"I had her in a nursing home. I have had her in the hospitals, and the hospitals would not take care of her any more, and the nursing home called me and refused to take care of her any more because she was mean to the other patients * * *. I even had difficulty getting Mrs. Munsell taken back to Mercy Hospital when she had been treated there as early as April 1945. She had caused too much trouble there for them and they told me not to bring her back there."

The record does not show how long before April 1945 Sophronia had caused trouble at Mercy Hospital or the nature thereof but it is a fair inference her conduct deviated substantially from normal conduct. Thereafter she was at St. Lukes Hospital from July 2 to July 6, September 14 and 15, and October 22 to November 6, 1945. Later, while in a nursing home, Sophronia tore the doors from, and broke the side of, a clothes cabinet, damaging it beyond repair.

In justification of an application to repair the house, made by her as guardian, Mabel testified:

"It was in terrible condition. The paper was falling off. the walls, and where she had fallen against it there was blood on the walls. * * * She had climbed the stepladder and used a knife to the [kitchen] ceiling. * * * She cut chunks right out of the ceiling."

Some of the windows were broken, screens were out of repair, and Sophronia had put rags in the plumbing.

However, when questioned about Sophronia's competency, Mabel testified Sophronia gradually recovered physically after leaving Mercy Hospital in May 1945; did her own work, etc.; Mabel was there almost every day; Sophronia bought some clothing, ordered part of her groceries by telephone and paid for groceries when they came to the house; she was of very sound mind until she fell down the attic steps in October. "About the 24th day of October her mind was not right then. * * * Just after that fall when she hit her head is what was doing it."

Mabel's husband testified his mother had refused to loan or give him money; she "never let me transact any of her business, she left that up to the wife" who had her love, respect, trust and confidence; in the summer of 1945 she kept her home and telephoned for and paid for her groceries but otherwise depended upon Mabel to pay her bills or go with her; she went to a shoe shop and had her shoes repaired; she seemed to be of sound mind until her fall in October.

A woman who maintained a nursing home testified that in the Fall of 1945 Sophronia asked for a room, but thought $20

a week asked for her care was too high; they visited for four hours and Sophronia appeared to be of sound mind.

Sophronia's assets were $2,200 in preferred stock, a $2,500 interest in a farm, the life estate in her home, household goods, and $10,958 deposited in Merchants National Bank. The bank account had been in the joint names of Sophronia and Mabel for a few months, but Sophronia had changed it to an individual account in her name in June. July 9, 1945, this deposit was withdrawn and carried to Peoples Savings Bank in the form of currency.

The teller in Peoples Savings Bank who handled the opening of the joint bank account was a witness for Mabel. She testified Mabel did most of the talking and Sophronia said a few words; Mabel told the teller they wanted to open a joint account; they signed the signature card; the agreement printed upon it was not read to them.

Mabel's testimony to the contrary (she testified twice and changed her story after a bank teller testified) was admitted over objections that it was a personal transaction with Sophronia concerning which Mabel was an incompetent witness under section 622.4, Code of 1946. Mabel testified Sophronia did the talking and Mabel said nothing "only signed my name as I was asked" by Sophronia.

██ The signing by Mabel and Sophronia of the signature card upon which Mabel bases her claim, was a personal transaction between them. Their acts in connection therewith, as well as their words, were a part of that transaction. Watters v. McGreavy, 111 Iowa 538, 540, 541, 82 N. W. 949; 19 Iowa L. Rev. 533; Enabnit v. Hanson, 228 Iowa 470, 292 N. W. 181; O'Dell v. O'Dell, 238 Iowa 434, 448, 26 N. W. 2d 401, 408. Having testified she executed the agreement, Mabel could not avoid the bar of the statute by asserting she said nothing. Her testimony concerning the transaction should not have been admitted nor considered.

Mabel made the following withdrawals from the account: October 15, 1945, $1,000; October 24th, $100; November 7th, $75; December 8th, $100; January 14, 1946, $100; January 28th, $165; February 9th, $600; February 13th, $800; March 5th, $500.

At the trial. Mabel produced six slips of paper containing orders made and signed by Sophronia for the respective amounts of the first six withdrawals. One states: "Please let Male Munsell have one thousand dolars"; another, "Please let Mable Munsell have one Hundred dollars & oblige." The others were similar in form. Mabel testified she secured an order prior to each withdrawal. None of these slips was presented to the bank by Mabel. The record does not show her purpose in procuring their execution by Sophronia but such purpose appears to have been devious because she knew they were unnecessary and that she would not use them. The first three orders were written upon slips torn or cut from the same piece of paper, which would warrant an inference the three were made together about November 7th, the date of the third withdrawal.

■ I. The trial court found Sophronia was competent July 9, 1945. One reason stated is that Sophronia wrote the withdrawal slips. The record indicates all, or practically all, of these were made after Mabel concedes Sophronia was not of sound mind and two were made at the County Home after she had been adjudicated insane. That Sophronia made these orders might justify an inference she did not understand' the form of her deposit was such that Mabel could appropriate it without them. However, it would not tend to show she was competent in July 1945. Likewise, the form and contents of a letter Sophronia wrote her guardian in 1946 after she was adjudicated insane would not in this case support a finding she was competent in July 1945. Nor would the managing of her own household, as the evidence shows it was managed, afford much support. The test is whether she had sufficient capacity to enable her to understand and comprehend in a reasonable manner the nature and consequences of the questioned business transaction. Brewster v. Brewster, 194 Iowa 803, 188 N. W. 672.

The other reason stated—that Sophronia once bargained for her care at a nursing home—tends to support the finding. Reference has already been made to medical testimony and other evidence Sophronia was incompetent. However, in view of our conclusions hereinafter stated, we need not determine whether

there was substantial evidence to support the finding of competency.

■ II. The successor guardian also charged in substance that the transfer of Sophronia's money into the joint account, which the daughter-in-law Mabel claims constituted a gift to her, was procured by Mabel while she was the dominating person in a fiduciary and confidential relation between Sophronia and herself. It is the rule that every transaction between such parties, by which the superior party obtains a possible benefit, is presumed invalid and the burden is upon such party to rebut the presumption of overreaching on his part, and to affirmatively establish that in the transactions in question he took no advantage of the inferior party but that the latter acted voluntarily with freedom, intelligence and a full knowledge of all the facts. Merritt v. Easterly, 226 Iowa 514, 284 N. W. 397; Curtis v. Armagast, 158 Iowa 507, 138 N. W. 873.

This rule is recognized in the Findings, Conclusions and Rulings of the trial court. However, the court found the evidence failed to show the existence of such relationship or that Mabel was the dominant party. We do not think anything in the record supports these findings.

It is true Mabel did many things for Sophronia as a friend, daughter-in-law and associate and also acted as an errand woman. She took Sophronia shopping and "was holding on to her to assist her in walking." She was at Sophronia's home almost every day and doubtless assisted there. Conduct of this nature is frequently present in an informal fiduciary relationship. It does not tend to indicate the absence of such relationship or that Mabel was not the dominant party.

In her sworn application for appointment Mabel stated:

"That this plaintiff has for several years last past looked after the affairs of said defendant by and with her consent and at her request, and has made arrangements from time to time for her hospitalization and care, and has looked after payment of her bills."

Mabel testified, my husband "wanted me to be appointed [guardian] because I had taken care of her affairs for so long for her."

When hospitals refused Sophronia readmission because of her past conduct, Mabel arranged for her placement elsewhere. Mabel had access to Sophronia's safe-deposit box in the bank. The bank teller, who was the only competent witness to the joint deposit transaction, testified it was Mabel who instructed her they wanted a joint account. Apparently Mabel was thereafter able to secure from Sophronia signed orders to draw any amounts Mabel desired. Sophronia made no withdrawals other than $50 in March 1946, after Victor went to Cedar Rapids and investigated. Mabel's husband testified Sophronia left the transaction of her business "up to" Mabel who had her trust and confidence. Other circumstances and evidence accord with the foregoing. There was no evidence to the contrary. The record requires the conclusion there was a fiduciary relationship in which Mabel was the dominant party.

Johnson v. Johnson, 196 Iowa 343, 348, 191 N. W. 353, 355, states:

"It is a rare case where the dominant individual in a fiduciary relation can sustain a gift to himself by the one who is dependent upon him. Whereas the defendant had assisted her husband in his few matters of business before his illness, she had now, by his illness, become his sole dependence. If someone else had sought to obtain a conveyance of his property, she would have been his independent adviser, and would have protected him against ill advised action. Inasmuch as she became the beneficiary of this transaction, he was necessarily deprived of her help and advice. In such a case, equity inquires, Who was his helper? Did he have any? Did he have independent advice, legal or otherwise? If his wish had been to refuse the gift, was there anyone to stand for him and to put forward the refusal? It is incumbent upon the defendant to make some answer to these questions."

There was no evidence to rebut the presumption of overreaching which arose out of the benefit obtained by Mabel from Sophronia from the transaction. As we understand the record, the trial court so found. It follows that the joint deposit agreement and alleged gift to Mabel were invalid, that the bank

account was the property of Sophronia, and Mabel had no right nor interest therein.

 III. Mabel converted to her own use approximately $3,000 of the $3,450 withdrawn by her. The exact amount was not determined. In the accounting phase of the case the chief concern of all parties appears to have been the amount of the liability of the surety on her bond. Concerning the $1,000 Mabel withdrew October 15, 1945, she testified she went with it to Sophronia's home and last saw it in Sophronia's hand about ten or fifteen minutes after she withdrew it, and had not since seen it.

This testimony merely created an inference of payment and was insufficient to support a finding of payment. Slezak v. Krisinger, 202 Iowa 422, 210 N. W. 436. It is hardly necessary to point to the improbability of Mabel's story about the $1,000, under the circumstances of this case. Furthermore, she had written Victor she was asking Sophronia for $1,000 for herself and husband and $1,000 for Victor. Later she wrote Victor that he would not get his $1,000 because Sophronia could not afford it. Also bearing upon the credibility of her testimony that she last saw the $1,000 in Sophronia's hand is her similar testimony concerning a $100 withdrawal. Later she testified the $100 was used by Mabel to pay Sophronia's bills and produced account sheets (of doubtful authenticity) to so show.

 However, she pleaded insolvency from and after appointment as guardian. The trial court found that on and after February 13, 1946, she was insolvent and had no property over and above her debts from which, with reasonable diligence, she could have recouped or recovered for Sophronia's estate the amounts owed it for Mabel's withdrawals prior to her appointment. Without detailed discussion we will say there was some evidence she had no nonexempt property (aside from withdrawals hereinafter considered) and could not have recouped any part of the $1,000 for the estate. Under the rule referred to by the trial court and hereinafter considered, her liability for this $1,000 was personal and not as guardian. It may be well to observe that Mabel's financial statement made to the surety company when she applied for her bond as guardian, and the testimony and report of its agent who pre-

pared the same should not have been excluded as confidential communications. That the agent for the surety company was also Mabel's attorney would not make such disclosures confidential. See 70 C. J., Witnesses, section 550. Moreover, communications to an attorney which a client consents be transmitted to others are not deemed privileged. Lewis v. Beh, 206 Iowa 281, 218 N. W. 944, 220 N. W. 126.

■ Sureties on the bond of a guardian, executed after he has converted property of his ward to his own use, are liable for the defalcation, if, after the bond is executed, he continues solvent, so that he could have restored the fund to the trust, which he failed to do. McEwen v. Fletcher, 164 Iowa 517, 146 N. W. 1, Ann. Cas. 1916D, 631; In re Estate of Windhorst, 227 Iowa 808, 288 N. W. 892; Knepper v. Glenn, 73 Iowa 730, 36 N. W. 763; 39 C. J. S., Guardian and Ward, section 200d; 21 Am. Jur., Executors and Administrators, section 195.

■ "The duty imposed by law for him to protect his wards from loss by neglect to exercise reasonable diligence to collect debts owing to them, rested more heavily upon him when he was their debtor by his own wrongful act than it would if he had merely failed to collect a debt from some third party." Aetna Indemnity Co. v. State for use of Gillaspy, 101 Miss. 703, 721, 57 So. 980, 982, 39 L. R. A., N. S., 961.

■ The sureties are, of course, liable for the guardian's defalcation after the bond takes effect, irrespective of the guardian's solvency. They may be held liable also for the guardian's failure to exercise reasonable diligence to collect debts owed the ward by others as well as those owed by the guardian himself.

■ IV. Mabel's bond was filed and approved February 13, 1946. March 5th she drew and converted $500. The court properly charged Mabel and her surety with this amount. Mabel as guardian and her surety were charged also with $800 withdrawn February 13th and used to purchase an automobile. There was also a charge of $18.75 on another item. These charges totaled $1,318.75. After allowing certain credits the court found Mabel, in her capacity as guardian, was accountable for

$1,219.75 and required the surety to pay that amount. There is no complaint as to the items involved in this computation.

However, the successor guardian contends various additional items should have been surcharged. Among these is $88.30, which was part of the withdrawal made January 28th. This was used to pay an automobile repair bill February 16th. Hence it was in Mabel's possession after she became guardian and she was liable for it as guardian. Another item is $275 which Mabel gave or loaned her husband. This was part of the $600 she drew February 9th. The husband knew the source of the money he received. The record indicates he was solvent. Mabel neglected to exercise reasonable diligence to collect this $275 for the estate of her ward. Hence her account should have been surcharged therewith. A third item is $50, from the February 9th withdrawal, paid by Mabel on a mortgage on her home. Mabel held all the money converted by her as trustee of a constructive trust. Although the homestead was exempt the trust attached to it for the $50 payment. Warsco v. Oshkosh Sav. & Tr. Co., 190 Wis. 87, 208 N. W. 886, 47 A. L. R. 366; American Ry. Exp. Co. v. Houle, 169 Minn. 209, 210 N. W. 889, 48 A. L. R. 1266. Therefore, it was a collectible item for which the bond was liable.

In addition to the $1,219.75, the foregoing items, aggregating $413.30, should have been surcharged to the account of the guardian and her bond and the liability thereon for money converted from Sophronia's bank account should have been fixed at $1,633.05, together with interest thereon from April 2, 1946. See Ellyson v. Lord, 124 Iowa 125, 141, 99 N. W. 582.

V. The surety contends it was not a party to the proceedings and the court was without jurisdiction to enter judgment against it on the bond. The record shows it was represented in the action by its attorneys. One of them testified:

"Realizing that what takes place here is in many instances res adjudicata on the matter of the bond, I am assisting in the defense in this action and am employed in so doing by the Mutual Surety Company of Iowa."

The surety company was interested in all phases of the accounting and its attorneys actively participated therein. However, it was the only party financially interested in establishing the insolvency pleaded by Mabel. Mabel was indebted to Sophronia's estate for all the money converted by her, irrespective of her insolvency. It is obvious the defense of insolvency was made for and by the surety.

The surety was not a necessary party to the accounting. See In re Estate of Davie, 224 Iowa 1177, 278 N. W. 616. Nor did the bond or any contract require it to conduct Mabel's defense or assist therein. It voluntarily came into the case and participated in the trial, although not in its own name. The appeal was conducted by its attorneys. Hoskins v. Hotel Randolph Co., 203 Iowa 1152, 1159, 211 N. W. 423, 427, 65 A. L. R. 1125, states:

"The principal question argued is whether the Otis Elevator Company was in court or a party to any issue involving its liability. It was in fact in court, though not in its own name. In substance, it was a party. It had its day in court upon every question litigated. It had the right of appeal. It was bound by the judgment, and cannot relitigate the questions determined by it."

The quoted language is here applicable. We conclude the rendering of judgment against the surety was not error.

Upon the appeal of the successor guardian the cause is remanded for the entry of modification of the judgment in conformity herewith. Upon the cross-appeal the judgment is affirmed. All costs on appeal are taxed to the cross-appellants.— Modified, affirmed and remanded.

MULRONEY, C. J., and BLISS, HALE, GARFIELD, MANTZ, SMITH, and HAYS, JJ., concur.