MARY IPSEN et al., Appellees, v. LOUIS F. RUÉSS, individually and as Executor of the purported last will and testament of J. W. RUESS, et al., Appellants.

## No. 47341.

(Reported in 35 N. W. 2d 82)

DECEMBER 14, 1948.

Pauline M. Kelley and Ries, Dutcher & Osmundson, all of Iowa City, for appellants.

D. C. Nolan and A. C. Cahill, both of Iowa City, and Robert Brooke and Harold Keele, both of West Liberty, for appellees.

GARFIELD, J.—Testator, J. W. Ruess, a bachelor who lived in West Liberty, died on October 7, 1946, at seventy-two. His will, dated May 15, 1942, was admitted to probate without objec-

tion in November 1946. This action to set aside probate was commenced in June 1947 by eleven nieces and nephews, issue of deceased brothers and sisters of testator.

The will was prepared by attorney J. E. McIntosh of West Liberty. Subject to payment of debts and two other unimportant provisions, the will divides the estate into three equal parts between a nephew, Louis Ruess, a niece, Hazel Romaine Consamus, and (the remaining part to) a sister, Mrs. Hoffelder, and her son, a nephew, Raymond Hoffelder. These four beneficiaries and Louis as executor are proponents.

By deeds dated the day before the will bears date testator had conveyed his 80-acre farm to the nephew Louis and wife and his home in West Liberty to the nephew Raymond. The will provides the farm was valued at $12,000 and the home at $5000, these amounts should be considered part of the estate and the shares of Louis and Raymond respectively charged therewith. Louis is named executor without bond. The total estate approximates $40,000 in value.

Testator lived with his widowed mother and unmarried sister on a farm near West Liberty until 1918 when the three moved into town together. After the mother died testator and his sister Frances continued to live in the same home until Frances' death in 1940. Testator then lived alone his remaining six years.

The trial court submitted the issue of mental incapacity to the jury who found for contestants. In different ways proponents have challenged the sufficiency of the evidence on that issue. We first consider such challenge without reference to the numerous errors assigned upon questions of evidence.

I. We are inclined to hold the evidence, viewed in the light most favorable to contestants, sufficient to raise a jury question as to mental incapacity.

■■■ There can be no doubt contestants had the burden to prove mental incapacity at the very time of making the will. See In re Estate of Grange, 231 Iowa 964, 975, 2 N. W. 2d 635, 641; In re Hayer, 230 Iowa 880, 884, 299 N. W. 431, 434; annotation 168 A. L. R. 969, 970, 983.

Testator did not engage in business after he moved to West Liberty although he apparently looked after his property until

his last illness beginning in January 1946. Most of the evidence relates to the period following the death of the sister Frances in 1940. From that time on testator had hardening of the arteries which caused a serious heart condition at least by July 1945. In January 1946, he was very sick with a cardiorenal vascular disease. Testator was confined in an Iowa City hospital from July 6, 1946 until September 21, he then became unmanageable but not violent, was adjudged insane by Johnson county commissioners of insanity and taken to the State Hospital for the Insane at Mount Pleasant where he died October 7, 1946.

Testator had several illnesses during his last six years. He was a patient at the University Hospital in Iowa City for about ten days in April 1941. He then complained of severe pain in his abdomen and shortness of breath on mild exertion. The doctors found moderate arteriosclerosis with hypertension. Testator was examined twice at this time by Dr. Miller of the University Psychopathic Hospital because he had delusions there was glass in his food, "they" might want to poison him and at night somebody was looking in at him. On the second examination by Dr. Miller, however, these ideas had disappeared.

Testator (then sixty-seven) was next a patient at a Muscatine hospital from May 24 to 28, 1942—again complaining of severe pain in his left side which could have been caused by a stone in the ureter. His trouble was diagnosed as ureteral colic. For two weeks in June and July 1943, testator was in Mercy Hospital in Iowa City, troubled with similar pain in the left abdomen and colitis. The hospital record for July 5 states the patient feels much better and "finally [is] becoming convinced his trouble is in his head."

Testator returned to Mercy Hospital on July 5, 1945, for seventeen days. The doctors diagnosed his illness then as myocarditis and heart disease. His arteriosclerosis had advanced to a moderately severe stage. However, Dr. Hennes who attended him at this time testified (as proponent's witness) testator was then normal mentally. His next trip to the hospital was during his last illness, as stated, in July 1946, following several months confinement to his own home and that of his nephew Louis Ruess.

The attesting witnesses to the will were Attorney McIntosh, who died before the trial, and his then secretary, Mrs. McMann, who testified for proponents. She knew testator casually. Her recollection of the making of the will was rather indistinct but she believed testator came to the law office in the morning to give the attorney the things he wanted put in his will, it was written up, and testator returned that afternoon and executed it. Mrs. McMann gave her opinion testator was of sound mind on that day and said she had not seen him "do anything foolish" at any time.

A contestant (a brother of proponent Louis) testified he saw testator on Main Street about 8:45 a.m. of the day previous to the date of the will, he appeared very weary, pale and worn out, Louis was with testator, assisted him to the car and they drove away. This is the nearest contestants' direct testimony comes to the time of making the will.

Seven of the eleven contestants testified to observations made by them of testator at various times generally between their Aunt Frances' death in 1940 and testator's death six years later, but expressed no opinion as to their uncle's claimed unsoundness of mind. Two other contestants told of their observations of testator and gave the opinion, based thereon, he was of unsound mind on May 15, 1942. Two other nonexpert witnesses, not parties to the suit, after detailing certain facts regarding testator, expressed an opinion testator was unsound mentally from about the fore part of 1941 until his death.

Two expert witnesses testified for contestants. Dr. Miller who, as stated, examined testator in April 1941, and Dr. Woods, a prominent psychiatrist, who had never seen him but gave the opinion testator was mentally unsound on and after May 14, 1942, in response to a long hypothetical question based on the hospital records of his confinement in the different hospitals as above related and various assumed matters of which it is claimed there was evidence.

Dr. Miller testified that in April 1941 testator was neurasthenic, showed signs of generalized arteriosclerosis and sclerosis of the blood vessels of the brain, had arteriosclerotic heart disease but not senility, and was of unsound mind when he first examined him but was considerably improved the following

day. Dr. Miller indicated testator's unsoundness was not perma-
nent but transitory—he did not appear psychotic. Dr. Woods
disagreed with this view, however, and testified in effect that
testator's mental condition was progressively worse from April
1941.

Some of the nonexpert testimony for contestants is that
testator changed for the worse both physically and mentally fol-
lowing his sister's death. Perhaps the most emphatic evidence
was given by contestant Mary Ipsen, in part substantially as
follows:

"After her funeral, I saw Uncle Will in the summer and
he was dejected, depressed and sort of off in space. From that
time until he was in the hospital in Iowa City in 1941, there was
an increase in his dejectedness. Once when I saw him in 1941
he was unshaven, staring at the ceiling, sort of talking to him-
self, and mumbling. I heard him say 'They have put glass in
my food,' also 'There is a man outside the door; he is a lawyer;
he is trying to get my money; all the nurses are crazy about
me. They want to marry me. Somebody is trying to get me.
I am afraid.' He did not appear to know me.

"After he left the hospital I saw him in West Liberty on
several occasions. He did not appear to recognize me or know
who I was. * * * He was not aware of the fact I was there.
He would ramble and not be able to carry on any coherent con-
versation, talk to himself, and look off into the distance. * * *

"He said he was afraid and was going to keep his doors
and windows locked, 'they are trying to get all my money,' and
whom he meant by 'they' I don't know. * * *

"In April 1942 I stopped at my uncle's residence with my
sister, Elizabeth. He did not appear to know I was present and
did not appear to recognize me. * * *

"Up until his last illness my observation was he was in a
condition of decline."

There is quite a little other evidence of similar character,
largely from other contestants. Together with Dr. Woods' testi-
mony, there is substantial evidence testator was of unsound mind
in April 1941, grew progressively worse thereafter and, it may
be inferred, was incapacitated on May 15, 1942, when the will

was made. Unquestionably he was unsound the last few weeks and probably the last few months of his life.

It is true there is an impressive array of witnesses for proponents who have drawn a quite different picture of testator. Some thirteen nonexpert witnesses, all apparently disinterested, most of them of long and rather intimate acquaintance (many of over thirty years) with testator, testified in effect they never observed any of the unusual matters related by contestants and gave their opinion he was of sound mind down to the time of his last illness in 1946.

Dr. Ady, testator's home physician who treated him except during the doctor's naval service from April 1, 1942 to December 15, 1945, also said he believed testator of sound mind whenever he saw him until about the summer of 1946. And, as stated, Dr. Hennes who treated testator in the Mercy Hospital in 1945 testified he then appeared mentally normal.

But the preponderance of the evidence does not necessarily depend on the number of witnesses on a given side nor their interest in the outcome of the trial, although these are proper considerations for the jury whose function it was to resolve the conflict in the testimony.

We have frequently said in effect that precedents are not controlling upon a question of this kind because the facts are usually not similar. However, these decisions lend support to our conclusion on the sufficiency of the evidence: In re Estate of Ring, 237 Iowa 953, 22 N. W. 2d 777; In re Estate of Maier, 236 Iowa 960, 20 N. W. 2d 425; In re Estate of Grange, supra, 231 Iowa 964, 2 N. W. 2d 635.

II. The remaining assigned errors pertain to questions of evidence. Over proponents' objections there were received in evidence the hospital records of testator's confinement and care in the University, Muscatine, Mercy, and Mount Pleasant Hospitals during the periods above mentioned from April 1941 to October 1946. While portions of these records bear rather remotely upon the issue in the case, we are inclined to hold them, except as indicated in Division III hereof, admissible. Gearhart v. Des Moines Ry. Co., 237 Iowa 213, 219, 21 N. W. 2d 569, 572, and citations.

We conclude there was sufficient foundation for the

1384

admission of these exhibits. Under our Gearhart decision it is not necessary that all entries on hospital records be verified by the physicians and nurses who make them provided it is shown by the custodian of the records they are authentic and made in the usual course of business and the manner of making them. Contestants did not clearly show the manner of making these records and that the entries thereon were made at or near the time of the events recorded but we think the showing in these respects adequate.

In view of the testimony, mainly of Dr. Woods, as to the permanent and progressive character of testator's mental disability the hospital records are not too remote in point of time from the execution of the will. See authorities cited at end of Division I, also annotations 124 A. L. R. 433, 437, 168 A. L. R. 969, 974.

III. As part of the record of the Mount Pleasant Hospital there was received the report of the physician appointed by the Johnson County Commissioners of Insanity, dated September 20–21, 1946, containing numerous questions and answers thereto evidently obtained from unidentified persons other than testator. (See sections 229.6, 229.7, Code, 1946.) Proponents objected to the offer because it contains hearsay matters which have nothing to do with the hospital record.

This exhibit (F-1) must have been offered as evidence of earlier insanity. One of the answers, for example, is that testator had had delusions of grandeur for several years. The answers to these questions do not pertain to the treatment administered at the hospital, were mere hearsay and should not have been received. Butler v. St. Louis Life Ins. Co., 45 Iowa 93, 96. See also Foy v. Metropolitan Life Ins. Co., 220 Iowa 628, 636, 263 N. W. 14; Valenti v. Mayer, 301 Mich. 551, 4 N. W. 2d 5, 7, and citations.

Also among the papers received as part of the Mount Pleasant Hospital record was a questionnaire evidently answered by Mrs. Hoffelder, sister of testator, four days after his admission to the hospital. One answer on this paper states that testator's sister Frances was in a hospital for mental disease at Davenport. Apparently on the strength of this statement someone changed another paper in the record by drawing a line

through the answer "none" to a query "Relatives or ancestors insane" and inserted "sister, Frances, was in hospt. in Davenport." We find no other evidence of Frances' claimed insanity.

These answers of Mrs. Hoffelder should also have been excluded. See authorities last above, especially Valenti v. Mayer, and citations. It is not claimed, nor could it be, this paper was admissible as a declaration of family history. It is possible, although we do not decide the point, the answer regarding the sister Frances might have been received as an admission against interest by proponent Mrs. Hoffelder individually. No such contention is made. Nor do we decide whether insanity of Frances might be shown. See on this question 57 Am. Jur., Wills, section 105.

■ A portion of the record of the University Hospital, upon like reasoning, should also have been excluded. It states that in 1930 Dr. Alcock wrote Dr. Ady concerning testator, "I think a good deal of his former trouble was a neurosis." This record was made in April 1941, apparently from a copy of a letter dated in 1930 found in the hospital. The letter copy would not be admissible nor is the statement in the record apparently taken therefrom competent evidence.

■ IV. It is claimed some contestants were permitted to testify to personal transactions or communications between the witness and testator in violation of the so-called dead man statute, section 622.4, Code, 1946. Such testimony seems to have been allowed on the theory it was a statement of observations of testator's acts and conduct or of a personal transaction or communication with testator in which the witness took no part.

Contestants were not incompetent under section 622.4 to testify solely to the appearance and actions of testator ascertained merely by observation (In re Estate of Talty, 232 Iowa 280, 282, 5 N. W. 2d 584, 585, 144 A. L. R. 859, and citations), nor to a personal transaction or communication with testator in which the witness took no part (O'Dell v. O'Dell, 238 Iowa 434, 446, 26 N. W. 2d 401, 407, and citations).

■ One contestant was permitted to testify over objection as to her competency that she was a clerk in a grocery store in 1942, testator came there at different times to buy provisions and she waited on him, he usually bought about the same items,

when she would give him his change he would count it over several times. We think this testimony relates to personal transactions between the witness and testator to which she was incompetent. The acts of the parties as well as their words were part of the transactions. In re Guardianship of Munsell, 239 Iowa 307, 315, 31 N. W. 2d 360, 364, and citations.

The same witness testified she visited testator shortly after he returned from the hospital in 1941 and, when asked how he appeared as to being alert, said "he appeared to be very confused about his treatment" in the hospital. Proponents moved to strike the answer because the witness was incompetent and the answer was a conclusion. The court ruled that if from observation the answer could be arrived at it is proper, but if in the opinion of the jury such conclusion could not be arrived at then the jury does not need to give the answer any consideration and added "the objection is overruled." We think the court should have sustained the motion on the ground the answer was an unallowable conclusion and its statement to the jury should not have been made.

In several instances the court overruled objections to the competency of contestants as witnesses but stated in substance it was a question for the jury whether the witness had a conversation with deceased; if she did, the testimony should be given no consideration; if she did not, then the jury might give it such weight as they believed it entitled to. We know of no precedent for such procedure under such a record as presented here. We think the court should have ruled definitely upon the competency of the witnesses to give the testimony in question.

Contestant Mary Ipsen testified on direct examination over objection as to her competency that she overheard testator say in a communication not to her, he was afraid, was going to keep the doors locked and "they are trying to get all my money." On cross-examination, however, she said the statement was made to her. Proponents then moved to strike the testimony because the witness was incompetent. The court overruled the motion and told the jury it was for them to resolve the conflict between the direct and cross-examination and if they believed there was a personal communication between the witness and testator, the testimony should not be considered.

We cannot approve this ruling. We have held under analogous circumstances that where it is shown on cross-examination the witness took part in a conversation in which she had previously testified she took no part, the testimony should, on motion, be stricken. In re Estate of Newson, 206 Iowa 514, 525, 219 N. W. 305, and citations.

V. Proponents contend the nonexpert witnesses who expressed an opinion testator was of unsound mind had not detailed sufficient facts upon which to base such opinion.

Before nonexperts may give their opinion of mental unsoundness they must first testify to facts reasonably tending to support the opinion. Neidermyer v. Neidermyer, 237 Iowa 685, 690, 22 N. W. 2d 346, 348, and citations; In re Estate of Heller, 233 Iowa 1356, 1362, 1363, 11 N. W. 2d 586, 590, and citations; 32 C. J. S., Evidence, section 507d, page 174. Whether sufficient facts have been detailed is primarily a question for the court in the exercise of a sound legal discretion. In re Estate of Maier, supra, 236 Iowa 960, 966, 967, 20 N. W. 2d 425, 428, and citations. We will not interfere unless it clearly appears such discretion has not been properly exercised. Campfield v. Rutt, 211 Iowa 1077, 1080, 235 N. W. 59, and citations; In re Will of Diver, 214 Iowa 497, 504, 240 N. W. 622. See also 32 C. J. S., Evidence, section 507d, page 176.

It does not appear there was an abuse of discretion in permitting the witnesses Margaret Angerer (except as hereinafter noted), Frank McGavish and contestant Mary Ipsen to express an opinion testator was of unsound mind. The facts detailed by them, especially by Margaret Angerer, are inconclusive and may not clearly point to mental incapacity. But they are somewhat inconsistent with mental soundness and furnish some support for the opinion given. This is enough to render the opinion admissible. Its value is measured by the strength of the facts on which it is based. See authorities heretofore cited in this division, also In re Estate of Workman, 174 Iowa 222, 231–234, 156 N. W. 438, and citations; 57 Am. Jur., Wills, section 128.

Margaret Angerer was not asked to base her opinion solely on the matters testified to by her although contestants sought to show this later by a leading question over an objection on

that ground. The opinion of a nonexpert as to mental incapacity must, of course, be based on matters previously testified to by him. In re Estate of Armstrong, 191 Iowa 1210, 1213, 183 N. W. 386, and citations; Neidermyer v. Neidermyer, supra, 237 Iowa 685, 690, 22 N. W. 2d 346, 348.

Contestant Edward Bryan expressed an opinion testator was of unsound mind during the month of May 1942. He testified he saw testator three times when he was in the University Hospital in April 1941, and next saw him when he was a patient at Mercy Hospital. The records of Mercy Hospital offered by .contestants show testator was not admitted there until June 27, 1943. This witness therefore did not observe testator between April 10, 1941 and June 27, 1943.

 A nonexpert witness must confine his opinion of insanity to the time of his observation of the person inquired about. In re Estate of Heller, supra, 233 Iowa 1356, 1363, 11 N. W. 2d 586, 590, and citations; 20 Am. Jur., Evidence, section 853, page 716; 32 C. J. S., Evidence, section 507d, pages 174, 175. Edward Bryan was therefore not qualified to express an opinion as to testator's insanity in May 1942, and proponents' objection to the testimony should have been sustained.

VI. As stated, in answer to a hypothetical question to which proponents objected Dr. Woods expressed the opinion testator was of unsound mind on and after May 14, 1942. The question assumed the truth of the statements in the various hospital records and other matters of which contestants claimed there was evidence. Since we have held in Division III hereof certain portions of these records should have been excluded, the doctor was not entitled to express an opinion based in part upon such portions.

 Further, we are convinced Dr. Woods should not have been permitted to express an opinion based in substantial part upon the assumed truth of all statements in the different hospital records. Many such statements are but opinions of the doctors or nurses who made the entries. It is firmly established that an expert witness may not base an opinion in whole or in part upon opinions of others, whether lay or expert, even though such opinions appear in evidence.

If the doctors and nurses who made entries of their opinions

in the hospital records had testified in person to the same effect, Dr. Woods could not properly have used their opinions as a basis for his. He should not be permitted to do so merely because their opinions come from the hospital records rather than from their lips as witnesses at the trial. In support of our conclusion see Cody v. Toller Drug Co., 232 Iowa 475, 480, 5 N. W. 2d 824, 828; Mt. Royal Cab Co. v. Dolan, 168 Md. 633, 179 A. 54, 98 A. L. R. 1106, and annotation 1109; 32 C. J. S., Evidence, section 536, page 257; id. section 551b, page 356; 20 Am. Jur., Evidence, section 850.

The hypothetical question put to Dr. Woods also assumed that testator "refused to permit a nephew with whom he had had cordial relations to enter his house." The only basis for such claimed refusal is this testimony of contestant Edward Bryan, "One time * * * he didn't answer when I knocked * * * about 5:30 p.m. I did not see my uncle on that occasion." There is no evidence testator was at home, much less that he saw the witness or refused him entrance. There is insufficient evidential basis for this assumed fact.

Hypothetical questions to an expert upon direct examination should be based upon facts the testimony tends to establish. Manatt v. Scott, 106 Iowa 203, 213, 76 N. W. 717, 68 Am. St. Rep. 293; Adams v. Junger, 158 Iowa 449, 459, 139 N. W. 1096, and citations; Boston v. Keokuk Elec. Co., 206 Iowa 753, 761, 221 N. W. 508; 57 Am. Jur., Wills, section 127.

VII. Proponents complain that the executor as contestants' witness was permitted to testify to the value and character of testator's property at the time the will was executed. It is not claimed this was not a proper subject of inquiry but that the witness was not shown to have sufficient knowledge of such matters to testify thereto. At least some preliminary showing of the knowledge of the witness should have been made. However, it is not apparent proponents were prejudiced by such testimony.

Objection is also made to the receipt in evidence upon contestants' offer of the probate inventory and preliminary inheritance tax report. It appears to be the rule that while the character and value of the estate at the time the will is executed may be shown, the size of the estate at time of death is not material to the issue. Ramseyer v. Dennis, 187 Ind. 420, 437,

119 N. E. 716, 719; Barricklow v. Stewart, 163 Ind. 438, 441, 72 N. E. 128, 129. However we are not persuaded this error if any was prejudicial. Ramseyer v. Dennis, supra.

VIII. Nonexpert witnesses Sullivan and Hendricks expressed the opinion testator was of sound mind on May 15, 1942. Complaint is now made that upon cross-examination they were asked in effect if they had knowledge of certain matters contestants claimed were shown by the hospital records. We find no proper objection by proponents to the questions complained of, at least until after answers were given, except perhaps in one instance. One question asked Sullivan was whether he knew of one of the matters we have held in Division III hereof should have been excluded. Upon a retrial such a question would not be proper. Generally a nonexpert witness should not be asked questions on cross-examination which assume facts not in evidence. 70 C. J., Witnesses, section 846. See also Streeter v. City of Marshalltown, 123 Iowa 449, 451, 99 N. W. 114; State v. Keul, 233 Iowa 852, 861, 862, 5 N. W. 2d 849, 855, and citations. We do not intimate there was any lack of good faith in the cross-examination of these witnesses.

IX. Proponents showed by an insurance agent that about the time the deeds and will were made the insurance covering the buildings on the farm deeded to Louis was changed accordingly. When the witness was asked at whose direction this was done, contestants' objection of hearsay was sustained. Contestants do not attempt to support the ruling, which is assigned as error, but point out there was no offer of proof and therefore no foundation for the claim of error. Proponents should have made an offer of proof. In re Estate of Heller, supra, 233 Iowa 1356, 1362, 11 N. W. 2d 586, 590, and citations; Hayes v. Chicago, R. I. & P. Ry. Co., 239 Iowa 149, 152, 30 N. W. 2d 743, 745.

However, it is quite apparent from the record proponents were attempting to show and the witness would have answered the insurance was changed at testator's direction. And the court had ruled the witness "certainly cannot state what testator said." In view of a retrial we feel we should state our conclusion upon this assignment of error although no formal offer of proof was made. See American Express Co. v. Des Moines

Nat. Bk., 177 Iowa 478, 494, 152 N. W. 625, and citations; Yocum v. Husted, 185 Iowa 119, 122, 167 N. W. 663; 4 C. J. S., Appeal and Error, section 291b(1), page 581.

■ We entertain no doubt the objection should have been overruled. Proponents were entitled to show that about the time the will was made testator was able to see to the transfer of insurance on property deeded by him to another. The applicable rule is that declarations of a testator, not remote in time, are competent on the question of testamentary capacity. Diesing v. Spencer, 221 Iowa 1143, 1147, 266 N. W. 567; Jenkins v. Robison, 194 Iowa 972, 979, 188 N. W. 765; Manatt v. Scott, supra, 106 Iowa 203, 211, 212, 76 N. W. 717, 68 Am. St. Rep. 293, and citations; 57 Am. Jur., Wills, section 124; 68 C. J., Wills, section 73.

■ X. Proponents placed in evidence three paper tablets upon which testator kept track of money spent by him from day to day. On contestants' rebuttal Dr. Woods testified over proponents' objection the witness was not qualified and "invading the province of the jury" that testator's ability to make the entries on these exhibits would have no effect upon his opinion of testator's mental capacity. We think the objection was rightly overruled. It was shown the witness had had much training and experience as a psychiatrist. The quoted portion of the objection was not good. Grismore v. Consolidated Products Co., 232 Iowa 328, 344–348, 5 N. W. 2d 646, 656, 657, and citations; State v. Knox, 236 Iowa 499, 520, 18 N. W. 2d 716, 726; note 28 Iowa L. Rev. 549, 551.

We have not separately discussed some of the thirty-three errors assigned and argued. They have been found without merit and sufficiently disposed of by the foregoing.—Reversed.

All JUSTICES concur.